**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| | * | |
| **MALCOLM MARKS** | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| **WASHINGTON WHOLESALE LIQUOR** | * | |
| **COMPANY LLC** | * | Case No.:  15-CV-1714 (JEB) |
| | * | |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFF MALCOLM MARKS'S MOTION FOR SUMMARY JUDGMENT
### AGAINST DEFENDANT WASHINGTON WHOELSALE LIQUOR COMPANY, LLC

Plaintiff Malcolm Marks, by and through his attorneys, George A. Rose, Esquire, John J. Leppler, Esquire, and the law firm, Rose Law Firm, LLC., hereby submits Plaintiff Malcolm Marks's motion for summary judgment against the Defendant, Washington Wholesale Liquor Company, LLC. The accompanying memorandum is attached hereto as support for this motion for summary judgment.

Respectfully submitted,

/s/ *John J. Leppler*
_____

John J. Leppler, Esq. #19736
George A. Rose, Esq. #26086
Rose Law Firm, LLC
200 E. Lexington St., Suite 1305
Baltimore, Maryland 21202
Tel: (410) 727-7555
Fax: (443) 320-0962
Attorneys for Plaintiff Malcolm Marks

S

**TABLE OF CONTENTS: MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF PLAINTIFF MALCOLM MARKS'S MOTION FOR SUMMARY
JUDGMENT AGAINST DEFENDANT WASHINGTON WHOELSALE LIQUOR
COMPANY, LLC**

I.      STATEMENT OF FACTS PERTINENT TO THIS MOTION…………………………..5

II.     STANDARD OF REVIEW…………………………………………….....................15

III.    ARGUMENT…………………………………………………………………………..16

    A.      The undisputed recorded evidence shows that Plaintiff has a prima
        face case for a 'failure-to-accommodate' claim pursuant to the
        ADA against Defendant ………………………………………………………16

        1.      Plaintiff has a disability under the ADA………………………………16

        2.      Defendant had notice of Plaintiff's disability; Plaintiff paralyzed
            arm…………………………………………………………………………..19

        3.      Plaintiff could perform the essential functions of his
            job as one of Defendant's liquor delivery helpers with or
            without his recommended reasonable accommodation of a
            motorized hand truck……………………………………………………..19

        4.      Defendant denied Plaintiff's request for a reasonable accommodation
            for his disability (his paralyzed right arm) and in this case,
            for Defendant to fix his motorized hand truck that became
            inoperable in March 2014……………………………………………..20

            a.      The reasonable accommodation to fix Plaintiff's
                inoperable motorized hand truck in 2014 did not place
                an undue hardship on Defendant…………………………………..22

    B.      The undisputed record evidence shows that Plaintiff has established his
        Retaliation claim against Defendant……………………………………………23

        1.      Plaintiff engaged in a protected activity by reporting his safety
            concerns to deliver liquor to Defendant's accounts, Wonderland
            Ballroom and A N D, because of the dangers of delivering to these
            accounts with Plaintiff's disability, and the accounts' OSHA violations;
            lack of handrails for the liquor delivery. ……………………………………24

        2.      Defendant's adverse employment action against Plaintiff; failing

to fix his inoperable motorized hand truck (DORS' recommended reasonable accommodation for Plaintiff to perform his job as Defendant's liquor delivery helper) when it became inoperable in February 2014……………………………………………………………………..24

3.   A casual relation exists between Plaintiff's protected activity and Defendant's adverse employment action.……………………………………26

   a.   The circumstances here show a temporal proximity between Plaintiff's protected activity and Defendant's adverse employment action and therefore there is a causal link exists…………………………26

4.   Plaintiff established his retaliation claim under the McDonnell-Douglas Framework. …………………………………………………28

   a.   Defendant's legitimate non-discriminatory reasons for Defendant's failure to fix Plaintiff's motorized hand truck when it became inoperable in February 2014……………………………………………...28

   b.   Defendants' legitimate non-discriminatory reasons stated above are pretext for its retaliatory conduct towards Plaintiff………………………………………………………………..29

IV.   CONCLUSION…………………………………………………………...........30

**TABLE OF POINTS AND AUTHORITIES: MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFF MALCOLM MARKS'S MOTION FOR
SUMMARY JUDGMENT AGAINST DEFENDANT WASHINGTON WHOELSALE
LIQUOR COMPANY, LLC**

1.    The Americans with Disabilities Act (ADA)
2.    Fed. R. Civ. P. 56(c)
3.    Blackwell v. SecTek, Inc., 61 F. Supp. 3d 149, 161 (D.D.C. 2014)
4.    Brady v. United States Capitol Police, 200 F. Supp. 3d 208 (D.D.C. 2016)
5.    Bugg-Barber v. Randstad US, L.P., 271 F. Supp. 2d 120 (D.D.C. 2003)
5.    Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)
6.    Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009)
7.    Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C.Cir.2002)
8.    Graffius v. Shinseki, 672 F. Supp. 2d 119 (D.D.C. 2009)
9.    Holcomb v. Powell, 433 F.3d 889, 902 (D.C.Cir.2006)…………………………………
10.   Hill v. Associates for Renewal in Educ., Inc., 69 F. Supp. 3d 260, 265 (D.D.C. 2014)
11.   Lee v. Dist. of Columbia, 920 F. Supp. 2d 127, 134 (D.D.C. 2013).
12.   Lytes v. D.C. Water & Sewer Auth., No. 05-204 (RMC), 2007 U.S. Dist.
      LEXIS 91154, at *16 (D.D.C. Dec. 13, 2007)
13.   McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d
      668 (1973)
14.   Moore v. Office of the Architect of the Capitol, 828 F.Supp.2d 254, 257
      (D.D.C.2011)
15.   Smith v. Dist. of Columbia, 430 F.3d 450, 454–55 (D.C. Cir. 2005)
16.   Solomon v. Vilsack, 763 F.3d 1, 9 (D.C.Cir.2014)
17.   Thompson v. Rice, 422 F. Supp. 2d 158, 165 (D.D.C. 2006)

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| | * | |
| **MALCOLM MARKS** | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| **WASHINGTON WHOLESALE LIQUOR** | * | |
| **COMPANY LLC** | * | Case No.:  15-CV-1714 (JEB) |
| | * | |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF MALCOLM MARKS'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT WASHINGTON WHOELSALE LIQUOR COMPANY, LLC

Plaintiff Malcolm Marks, by and through his attorneys, George A. Rose, Esquire, John J. Leppler, and the law firm, Rose Law Firm, LLC., hereby submits Plaintiff Malcolm Marks's motion for summary judgment against the Defendant, Washington Wholesale Liquor Company, LLC, and in support thereof states:

## I.        STATEMENT OF UNDISPUTED MATERIAL FACTS PERTINENT TO THIS MOTION

Plaintiff Malcolm Marks (hereinafter "Plaintiff"), a person with a documented disability under the Americans with Disabilities Act (ADA), having a paralyzed right arm, sought employment with Defendant Washington Wholesale Liquor Company, LLC (hereinafter "Defendant") in August 2010, as a liquor delivery helper (hereinafter "helper").[1] Plaintiff's primary duties and responsibilities as a helper involved accompanying the delivery truck driver on delivery assignments and assisting with the loading, off-loading and delivery of liquor to

---

[1] Exb. 2; *see also* Exb. #1 at p. 90-91, 223-224:17-22, 1-10, 13-22, 1-8.

Defendant's accounts(s) (a/k/a Defendant's customer(s)).[2] In order for a helper to perform his job to assist with loading and off-loading the liquor for delivery, a helper would use a manual hand truck in order to move the liquor on and off the delivery truck and into one of Defendant's account(s) (a/k/a Defendant's customer(s)).[3]

The corporate and/or organizational structure for Defendant is as follows; Kisha Day, a Human Resources employee at Defendant, reports directly to her supervisor, Jason Savage, the Vice President of Human Resources at Defendant.[4] Further, Michael Howe, the assistant general manager of operations at Defendant, and Defendant's Human Resources department, reports to John Hild, the vice president of operations for Defendant.[5]

In August 2010, Plaintiff interviewed for the helper position at Defendant, and interviewed with one of his potential supervisors if hired by Defendant for this job, Mr. Michael Howe, the assistant general manager at Defendant.[6] Plaintiff's primary duties and responsibilities as a liquor delivery helper involved accompanying the delivery truck driver on delivery assignments and assisting with the loading, off-loading and delivery of liquor to Defendant's customers.[7]

Plaintiff's first interviewer before Mr. Howe, Matthew Jackson, asked Plaintiff about his paralyzed arm to see if he could do the work at Defendant, and thereafter, Plaintiff's interview with Michael Howe, Mr. Howe believed Plaintiff's armed was paralyzed, following Mr. Howe's interview of Plaintiff.[8] During the interview, Mr. Howe told Plaintiff to contact one of Defendant's Human Resources personnel, Ms. Kisha Day, and gave Plaintiff Kisha Day's contact information,

---

[2] Exb. 5 at p. 57, 232-233, 301, 309-311: 4-22, 14-22, 1-4, 1-22, 1-22. 1-22. 1-22.
[3] Id.; *see also* Exb. #3 at p. 6-8: 5-21, 1-21, 1-5; *see also* Exb. #18.
[4] Exb. #5 at p. 9:1-14; *see also* Exb. #4 at p. 8-9: 7-21, 1-2; *see also* Exb. #6 a p. 13-14: 15-21, 1-5
[5] Exb. #5 at p. 9:1-14; *see also* Exb. #16; *see also* Exb. #17; *see also* Exb. #4 at p. 8-9:7-21, 1-2; *see also* Exb. #6 at p. 9-10:5-21, 1-4; *see also* Exb. #6 at p. 13-14:15-21, 1-5.
[6] Exb. #1 at p. 225-226, 228: 14-22, 1-4, 18-22; *see also* Exb. #5 at p. 13:10-14.
[7] Exb. #27; *see also* Exb. #1 at p. 232:14-22.
[8] Exb. #1 at p. 227-228: 12-22, 1-22; *see also* Exb. #5 at p. 28: 2-4.

regarding Defendant providing Plaintiff a reasonable accommodation so he can perform his job as a helper for Defendant, even with his disability.[9] In fact, Plaintiff indicated on his job application to Defendant for a helper position, before meeting with Mr. Howe, that Plaintiff can perform the essential functions of his job as a helper with or without a reasonable accommodation.[10] Plaintiff was hired as a helper following his interview with Mr. Howe, and January 2011, began using the manual hand truck to perform his job as one of Defendant's helpers.[11]

Plaintiff was a customer of the Maryland State Department of Education, Division of Rehabilitation Services (hereinafter "DORS").[12] DORS is a "training and placement facility that works with individuals with moderate to severe documented disabilities in hopes for them to obtain and/or maintain independence."

On or about June 21, 2011, a representative for the Division of Rehabilitation Services ("DORS") conducted a "occupational therapy" work-site assessment of Plaintiff's work performance, for a full day on the job, as one of Defendant's helpers, and Defendant knew this assessment would be taken on said date.[13] On August 17, 2011, DORS issued a lengthy report regarding Plaintiff, which stated that it is DORS' recommendation that Plaintiff, indefinitely, can perform the essential functions of his job as one of Defendant's helpers.[14] Per DORS' report, Plaintiff must utilize a motorized stair climbing hand truck to optimize Plaintiff work performance and reduce the risk of injury due to Plaintiffs paralyzed right arm.[15] This reasonable accommodation for Plaintiff would be a motorized hand truck that Plaintiff can use to perform his

---

[9] Exb. #1 at p. 229-231: 1-22, 1-22, 1-8. (NOTE: Michael Howe gave Plaintiff Kisha Day's contact information. Thereafter, Plaintiff passed Kisha Day's card of to Phelicia Ross, a DORS representative (*see* Exhibit #19)).
[10] Exb. #2; *see also* Exhibit #1 at p. 191-192: 14-22, 1-5.
[11] Exb. #1. at p 270: 6-13.
[12] Exb. #1 at p. 229: 1-21; *see also* Exb. #7; *see also* Exb. #29.
[13] Id. at 261-266: 5-22, 1-22. 1-22, 1-22, 1-12.
[14] Exb. #7; *see also* Exb. #4 at p. 47-52: 3-21. 1-21. 1-21, 1-21, 1-21, 1-17; *see also* Exb. #1 at p. 282:4-13
[15] Id.

job as one of Defendant's helpers, including Defendant being required to provide a secure storage space and charging area for the motorized hand truck.[16]

In March 2012, Plaintiff informed one of his immediate supervisors, Mike Howe (a manager in Defendant's Operations Management Department) that he needed a storage area for his motorized hand truck, and a power source in the warehouse and on the truck (in case the hand truck battery died while Plaintiff was out at work without any access to a power source (which is also a cigarette lighter)).[17] In this same month, March 2012, Plaintiff informed Mr. Howe that the power source installed in Plaintiff's work truck (truck 806) required repairs.[18] A few weeks after Plaintiff's request, Plaintiff followed-up with the shop mechanic regarding this matter.[19] The shop mechanic indicated to Plaintiff that Mr. Howe directed the mechanic not of fix the power source, which Mr. Howe knew Plaintiff used to charge the motorized hand truck, and which was in need of repairs.[20]

On or about May 15, 2012, Plaintiff filed a grievance report against Defendant because Mike Howe directed the mechanic not to be fix and/or order the power source cigarette lighter in Plaintiff's truck, truck number 806.[21] Shortly after this grievance report was filed, Defendant fixed the power source/cigarette lighter in Plaintiff's truck.[22]

On October 20, 2011, Mr. Mathew Jackson, a representative for DORS, emailed Kisha Day and stated,

> "…as you probably know, my office, [DORS], has been working with Malcolm Marks with the evaluation and purchase of a Motorized Hand Truck to assist him in performing his job duties

---

[16] Id.; *see also* Exb. #8.
[17] Exb. #30; *see also* Exb. #15 at p. 205-221 (all lines in said pages of the Exhibit).
[18] Id.
[19] Id.
[20] Id.
[21] Id.
[22] Id.

more efficiently. We purchased the following item that will be delivered to the work site by S.W. Betz Company

…

I spoke with Malcolm today and provided him with the information contained in this e-mail. He is aware that he is responsible for this equipment but we do need and appreciate your help in providing a secure space where the equipment can be locked up and plugged in when not in use..."[23]

Ms. Day then notified her supervisor, Mr. Jason Savage, who at all times pertinent hereto was the Vice President of Human Resources at Defendant. At this time, since Defendant's Human Resources personnel (Kisha Day and Jason Savage) apparently had not received any paperwork regarding Plaintiff's need for a reasonable accommodation, Defendant will 'hold-off' on contacting Mr. Jackson to deliver the motorized hand truck for Plaintiff.[24]

On October 21, 2011, Defendant received Plaintiff's request for his accommodation.[25] Plaintiff faxed a letter to Defendant, accompanied by DORS' 08/17/2011 report for Plaintiff's reasonable accommodation, a motorized hand truck. Plaintiff's letter stated the following:

I have a documented disability and I am requesting a reasonable accommodation to perform the essential functions of my job. My disabling condition is [a] permanent right forearm / hand injury…

I have been working with the Division of Rehabilitation Services (DORS) in evaluating for and providing the needed equipment. I am pleased to confirmed that the Motorized Hand Truck, Cargo Strap, Charger and Battery Retainer have been purchased by DORS and are ready to be delivered to the worksite.[26]

After Jason Savage received Plaintiff's letter referenced above that was faxed to Defendant on October 21, 2011, he knew that Plaintiff had a permanent disability, a paralyzed right arm.[27]

---

[23] Exb. #8 (Therein, Matthew Jackson's email address is mjackson@dors.state.md.us); *see also* Exb. #6 at p. 23-26: 1-21, 1-21, 1-21, 1-3
[24] Exb. #9; *see also* Exb. #4 at p. 51-52: 11-21, 1-1-10.
[25] Exb. #7; *see also* Exb. #4 at p. 47-52: 3-21. 1-21. 1-21, 1-21, 1-21, 1-17.
[26] Exb. #7; *see also* Exb. #1 at p. 282:4-13.
[27] Exb. #6 at p. 68-70: 5-21, 1-21, 1.

On November 1, 2011, Kisha Day, at the direction of Jason Savage, emailed Plaintiff regarding his motorized hand truck and stated,

> "… October 24, 2011 was the first time anything [referencing the 10/21/2011 paperwork faxed to her from Plaintiff that is referenced above] was sent to me in regards to this hand truck. Therefore, your request for an accommodation is currently under review. As it stands now, once you return to work, Jason [Savage] and I would like to speak with you in detail regarding this accommodation."[28]

On or about August 1, 2013, Plaintiff contacted his supervisor, Karl Fisher, and informed him that he could not deliver products to a certain customer (Wonderland Ballroom).[29] Plaintiff indicated to Mr. Fisher that he could not deliver to Wonderland Ballroom because the premises did not have a handrail to support Plaintiff's movement and maneuvers to bring the products down the steps.[30] Plaintiff feared for his safety due to his disability with the paralysis of his right hand.[31] Earlier, in July 2013, Plaintiff also brought to the attention of his supervisor Karl Fisher, that the lack of a handrail was a safety issue with the steps being very steep, and the Occupational Safety and Health Administration (OSHA) requires the customer (here, Wonderland Ballroom) to have handrails installed on the steps.[32] In response to Plaintiff's safety concerns with the lack of a handrail at the Wonderland Ballroom downstairs delivery site, Defendant targeted Plaintiff for disciplinary action, and told Plaintiff that "if he required any additional accommodations to do his job he would need to provide me with medical documentation".[33] Defendant, by and through its agents, servants, and/or employees, including Jason Savage, had never before asked Plaintiff to

---

[28] Exb. #10; *see also* Exb. #4 at p. 58:1-18.

[29] Exb. #15 at p. 222-223: 1-21, 1-21; *see also* Exb. #31; *see also* Exb. #6: 35-45 (all lines in said pages); *see also* Exb. #6 at p. 50-51: 1-21, 1-21.

[30] <u>Id.</u>; *see also* Exb. #15 at p. 222-226: 1-21, 1-21, 1-21, 1-21, 1; *see also* Exb. #6: 35-45 (all lines in said pages); *see also* Exb. #6 at p. 50-51: 1-21, 1-21.

[31] <u>Id.</u>; *see also* Exb. #15 at p. 236 – 243: 1-21, 1-21, 1-21, 1-21, 1-21, 1-21, 1-21, 1-21; *see also* Exb. #6: 35-45 (all lines in said pages); *see also* Exb. #6 at p. 50-51: 1-21, 1-21.

[32] Exb. #15 at p. 247-252: 1-21, 1-21, 1-21, 1-21, 1-21, 1-21; *see also* Exb. #15 at p. 222-226: 1-21, 1-21, 1-21, 1-21, 1; *see also* Exb. #6: 35-45 (all lines in said pages); *see also* Exb. #6 at p. 50-51: 1-21, 1-21.

[33] Exb. #31; *see also* Exb. #6 at p. 50-51: 1-21, 1-21.

provide medical documentation for his disability.[34] Shortly thereafter, Plaintiff filed an OSHA complaint related to Wonderland Ballroom because the handrails at Wonderland Ballroom were not fixed after Plaintiff reported this safety concern.[35] Thereafter, in late August 2013 and as a result of Plaintiff's filed OSHA complaint, Wonderland Ballroom terminated its business relationship with Defendant.[36]

From early September 2013 through some time November 2013, Plaintiff was out of work due to injury from a car accident.[37] From the time after Wonderland Ballroom terminated its business relationship with Defendant to Plaintiff's return to work in November 2013, Defendant did not discipline Plaintiff for his reported safety concern regarding Wonderland Ballroom's OSHA violation.[38]

On or about November 26, 2013, Plaintiff contacted his supervisor Jimmy Lundstrom regarding safety concerns about another customer (A N D), Plaintiff had complained "numerous times about this location not having any handrails on their steps that go downstairs", "to support himself while taking the goods on the handcart", "to ensure he does not slip and fall for any reason when going downstairs without something to grab and support himself".[39] Plaintiff also told Mr. Lundstrom that: "if the safety issues do not get resolved that he must go to OSHA to ensure that the concern gets resolved in one way or another."[40] In response, Defendant, confirmed that the

---

[34] There is nothing in the record that shows, after Defendant received Plaintiff's 10/21/2011 regarding DORS' recommendation for Plaintiff's reasonable accommodation (*see* Exb. #7), prior to this point, did Defendant request for Plaintiff to provide it additional medical documentation.

[35] Exb. #35.

[36] Exb. #36.

[37] Exb. #1 at p. 124-125: 13-21, 1-15; *see also* Exb. #37.

[38] Exb. #6 at p. 43-46: 14-21, 1-21, 1-21, 1-5.

[39] Exb. #32; *see also* Exb. #6 at p. 54-58: 2-21, 1-21, 1-21, 1-21, 1-2; *see also* Exb. #3 at p. 16-19: 3-21, 1-21, 1-21, 1-18.

[40] Exb. #32; *see also* Exb. #3 at p. 16-19: 3-21, 1-21, 1-21, 1-18.

customer was required to have handrails on the steps.[41] However up to December 9, 2013 Defendant, was focusing on taking action in relation to Plaintiff and not the customer.[42]

In February 2014, Plaintiff notified his supervisor, Jimmy Lundstrom, that his motorized hand truck (the reasonable accommodation DORS' provided plaintiff) became inoperable.[43] Thereafter, Michael Howe emailed John Hild, the Director of Operations at Defendant and the person who Mr. Howe is supposed to report to,[44] and Jason Savage, regarding Plaintiff's inoperable motorized hand truck. Therein, Mr. Howe sought advice regarding whether it was Defendant's responsibility to fix Plaintiff's motorized hand truck.[45] Shortly thereafter, Jason Savage responded to Michael Howe's email and stated that his initial thought is that Defendant is not responsible to fix his hand truck.[46] John Hild responded then responded to Jason Savage's email and stated,

> We have not afforded him, [Plaintiff] a ADA accommodation and
> we did not provide the equipment…[47]

As of March 10, 2014, at the latest, Defendant knew that Plaintiff was using a manual hand truck to perform his job as one of Defendant's helpers, while his motorized hand truck had yet to be fixed from the time it became inoperable at an earlier date in March 2014.[48] On April 1, 2014, while Plaintiff's motorized hand truck was inoperable, Kisha Day again ordered Plaintiff to provide additional medical document to Defendant regarding Plaintiff's need for a reasonable accommodation.[49] However, Defendant knew since October 2011 at the latest that; (1) Plaintiff suffers from a permanent disability, his paralyzed arm; and (2) DORS' recommendation of the

---

[41] Exb. #33.
[42] Exb. #33; *see also* Exb. #6 at p. 54-58: 2-21, 1-21, 1-21, 1-21, 1-2.
[43] Exb. #1 at p. 312-313: 2-222, 1-4; *see also* Exb. #15 at p. 43-44:10-22, 1-2; *see also* Exb. #3 at p. 50-51:14-21, 1-2; *see also* Exb. #25; *see also* Exb. #11; *see also* Exb. #34.
[44] Exb. #4: 26-28:10-21, 1-21, 1-21.
[45] Exb. #16; *see also* Exb. #5 at p. 53-54: 14-21, 1-11.
[46] Exb. #16; *see also* Exb. #26.
[47] Exb. #16; *see also* Exb. #5 at p. 53-54: 14-21, 1-11.
[48] Exb. #17; *see also* Exb. #15 at p. 161:11-18.
[49] Exb. #20; *see also* Exb. #4 at p. 122:1-21.

reasonable accommodation for Plaintiff, the motorized hand truck, is because of Plaintiff's permanent disability.[50] Despite this knowledge, after Plaintiff's hand truck became inoperable in March 2014, Defendant requested that Plaintiff provide additional medical documentation related to his permanent disability and his need for this reasonable accommodation.[51] In fact, Defendant consulted with its legal counsel before Defendant's HR personnel, specifically Kisha Day, made this request to Plaintiff. [53]

On May 13, 2014, while Plaintiff's motorized hand truck was still inoperable, Plaintiff filed a grievance related to Defendant's failure to fix his motorized hand truck.[54] On May 13, 2014, in response to Plaintiff's 05/13/2014 filed grievance, Michael Howe stated his own chronology regarding Plaintiff's motorized hand truck and whether Defendant was required to fix it.[55] Therein, Michael Howe stated the following;

> (1) Plaintiff notified his supervisor, Jimmy Lundstrom that his motorized hand truck became inoperable. Mr. Howe further informed Plaintiff that Defendant's mechanic, "Kenny", could not work on Plaintiff's motorized hand truck and that Mr. Howe would need to seek some consultation on how Defendant would need to move forward with fixing the motorized hand truck. Plaintiff even told Mr. Howe that he would pay for the repairs of his motorized hand truck. In response, Mr. Howe told Plaintiff that once he receives guidance, Mr. Howe will follow up with Plaintiff regarding the repairs of his motorized hand truck[56];

> (2) when Plaintiff asked Mr. Howe if he had information regarding fixing Plaintiff's motorized hand truck, Mr. Howe said that he is "waiting to hear back from HR, [i.e. Human Resources at Defendant]"[57]. Kisha Day then informed Mr. Howe that she was going to have a conversation with Plaintiff regarding his motorized hand truck; and

> (4) Between April 1 and April 4, 2014, John Hild informed Mr. Howe that the repair expense for Plaintiff's motorized hand truck was Plaintiff's responsibility and that

---

[50] Exb. #6 at p. 68-70: 5-21, 1-21, 1; *see also* Exb. #7; *see also* Exb. #4 at p. 122:1-21; *see also* Exb. #20.
[51] Exb. #4 at p. 122:1-21; *see also* Exb. #20.
[53] Exb. #6 at p. 83-84: 15-21, 1-14.
[54] Exb. #11; *see also* Exb. #13.
[55] Exb. #12.
[56] Id.
[57] Id.

Plaintiff could either have someone come to Defendant to fix it or Plaintiff could take the motorized hand truck to the repair shop himself.[58]

Of note, on or about May 13, 2014 Defendant's HR Manager, Regina Mark, sent an email to Kisha Day and Jason Savage stating: "Michael, mentioned that there is more to the story regarding Mr. Marks' request for accommodation, and his paralyzed hand. He says that he is not 100% aware of everything that HR had discussed and that I should be briefed by you all."  In response, Jason Savage stated: "No worries, we can discuss."

In late June 2014, while Plaintiff's motorized hand truck remained inoperable, Plaintiff took his motorized hand truck to be repaired.[59] Defendant's own HR Policy no. 2.14 states in pertinent part, to "make reasonable accommodations for qualified individuals with known disabilities, unless doing so would result in an undue hardship to the operation of our business…"[60] The cost for the repairs of Plaintiff's motorized hand truck was $424.29[61], and in any case, all Defendant needed to do was approved repairs to be done at the jobsite.

In July 2014, Plaintiff had a hearing with Defendant and his Union related to his 05/13/2014 filed grievance related to his inoperable motorized hand truck.[62] Defendant did in fact reimburse Plaintiff for the expenses for the repairs of his motorized hand truck.[63] Following the grievance meeting, Jason Savage emailed John Hild as follow-up after the grievance meeting took place and stated,

> Marks ADA – we can review details but in the end he is going to provide us additional documentation.[64]

---

[58] Id.; *see also* Exb. #6 a p. 87-88:13-21, 1-5.
[59] Exb. #1 at p. 342-343: 2-22, 1-11; *see also* Exb. #21.
[60] Exb. #27.
[61] Exb. #1 at p. 342-343: 2-22, 1-11; *see also* Exb. #21.
[62] Exb. #6 at p. 119: 10-16.
[63] Exb. #22; *see also* Exb. #1 at p. 351-353: 22, 1-22, 1-8.
[64] Exb. #23; *see also* Exb. #6 at p. 117 – 119: 2-21, 1-21, 1-8.

Moreover, on July 16, 2014, in response Defendant's 04/01/2014 request, Plaintiff provided a Defendant with a signed medical report from his medical doctor regarding Plaintiff's permanent disability; his paralyzed arm.[65]

## II.    STANDARD OF REVIEW

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate when the pleadings and the evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Thompson v. Rice, 422 F. Supp. 2d 158, 165 (D.D.C. 2006) (granting summary judgment on plaintiff's failure to accommodate claim because the plaintiff was not disabled under the Rehabilitation Act).[2] All "justifiable inferences" are to be drawn in the nonmoving party's favor; however, in order to avoid summary judgment, the non-moving party must establish "more than the mere existence of a scintilla of evidence in support of its position." *See* Lytes v. D.C. Water & Sewer Auth., No. 05-204 (RMC), 2007 U.S. Dist. LEXIS 91154, at *16 (D.D.C. Dec. 13, 2007) (granting summary judgment on plaintiff's failure to accommodate and wrongful termination claim under the ADA because the plaintiff was not disabled) (internal citation and quotations omitted); *see also* Bugg-Barber v. Randstad US, L.P., 271 F. Supp. 2d 120, 125-26 (D.D.C. 2003) (granting summary judgment on plaintiff's ADA and DCHRA claims because she had not requested an accommodation, her employer nevertheless reasonably accommodated her, and she failed to exhaust her administrative remedies for her claim). Particularly relevant to this case, "[b]y pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment." Lytes, 2007 U.S. Dist. LEXIS 91154, at *17 citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Based upon these standards and the undisputed record in this case,

---

[65] Exb. #14.

Plaintiff is entitled to summary judgment on his 'failure to accommodate' claim in violation of the ADA against Defendant.

## III.   ARGUMENT

**A.   <u>The undisputed recorded evidence shows that Plaintiff has a prima face case for a 'failure-to-accommodate' claim pursuant to the ADA against Defendant</u>.**

To prove a prima facie case for a failure-to-accommodate claim under the ADA, Plaintiff must show that; (1) Plaintiff was disabled within the meaning of the [ADA]; (2) Defendant had notice of Plaintiff's disability, his paralyzed right arm; (3) Plaintiff was able to perform the essential functions of his job as one of Defendant's  helpers with or without his recommended reasonable accommodation of a motorized hand truck; and (4) Defendant denied his request for a reasonable accommodation for his disability (his paralyzed right arm *See generally* <u>Floyd v. Lee</u>, 85 F. Supp. 3d 482, 499 (D.D.C. 2015) (citing <u>Solomon v. Vilsack</u>, 763 F.3d 1, 9 (D.C.Cir.2014). <u>Floyd</u>, 85 F. Supp. 3d 482 at 499. The employer's motivation for refusing the accommodation plays no part in that analysis, and therefore reasonable-accommodation claims are "not subject to analysis under <u>McDonnell–Douglas</u>. *See* <u>Hill v. Associates for Renewal in Educ., Inc.</u>, 69 F. Supp. 3d 260, 265 (D.D.C. 2014); *see also* <u>Lee v. Dist. of Columbia</u>, 920 F. Supp. 2d 127, 134 (D.D.C. 2013).

### 1.   Plaintiff has a disability under the ADA.

To establish the first element of a prima facie case, an individual must show that she is disabled within the meaning of the ADA. <u>mental impairment</u> that substantially limits one or more of her major life activities; (2) has a record of such an impairment; or (3) has been regarded as having such an impairment. *See* <u>Weigert v. Georgetown Univ.</u>, 120 F. Supp. 2d 1, 7 (D.D.C. 2000). Moreover, the <u>Weigert</u> Court stated,

> Although the ADA does not define the terms "substantially limits" or "major life activity" in its definition of impairment, *see* <u>Siragy</u>, 1999 WL 767831 at *3, the Equal Employment Opportunity Commission ("EEOC") has issued regulations that elaborate on the meaning of these terms. *See* <u>Venclauskas v. Connecticut Dep't of Public Safety</u>, 921 F. Supp. 78, 81 (D.Conn.1995). For example, the EEOC defines an individual as substantially limited when she is "[u]nable to perform a major life activity that the average person in the general population can perform" **<u>or when she is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity</u>**" as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The EEOC defines major life activities non-exhaustively as "**<u>functions such as caring for oneself</u>**, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, **<u>and working</u>**." <u>Id</u>. at § 1630.2(i).

<u>Id</u>. (emphasis added)

Here, Plaintiff has a disability under the ADA; his paralyzed right arm.[66] Defendant knew Plaintiff had this permanent disability, a paralyzed arm in October 2011 at the latest, if not at the time Plaintiff was interviewed for his employment at Defendant.[67] Further, Defendant knew in October 2011 that DORS recommended that Plaintiff be awarded the reasonable accommodation of a motorized hand truck because of Plaintiff's disability.[68]

Moreover, Plaintiff's disability significantly limits his ability to perform major life activities. Specifically, Mr. Marks' wife, Karen Marks, testified as follows. In summary, Ms. Marks' and Mr. Marks sexual relations significantly declined from the time Mr. Marks became disabled as a result of being shot in 2006:

> Q.     So from the start of your marriage until the decline in the frequency of the sexual relationships, did you and Mr. Marks have sexual relationships every day a week?

---

[66] Exb. #13; *see also* Exb. #14; *see also* Exb. #7.
[67] Exb. #1 at p. 227-228: 6-22, 1-22;  *see also* Exb. #7.
[68] <u>Id</u>.

A.      We had it at least---well, you know, when you first starting out, you hot and heavy, so it went down.

...

A. … So our regular release was at least three times a week.

Q.      When did that setline in, sort of the newlywed period wear off and the regular period, do you recall about when that was?

A.      No, I don't

…

Q.      Would you say it was around regular three times a week around the time he was shot in 2006?

A.      Yes.

…

Q…So even aside from whether or not he [, Plaintiff,] took the medicine, did you ever see a point at which his ability to get an election improved?

A.      No. [69]

Finally, although Plaintiff did perform his job without his reasonable accommodation (a motorized hand truck) for a period of time, he was injured because of this. Plaintiff's physicians who are specialists in orthopedics, Emily Woolcock and Michael Wallace, indicated that Mr. Marks was injured because of his use of the manual hand truck for an extended time after his hand truck became inoperable on or about February 14, 2014.[70]   For these reasons, Plaintiff was significantly restricted in "major life activities" because of his disability.

**2.      Defendant had notice of Plaintiff's disability; Plaintiff's paralyzed arm**.

---

[69] Exb. #24 at p. 80-82:  22-25, 1-21, 1-12.
[70] Exb. #25; *see also* Exb. #26; see also Exb. #34; *see also* Exb. #39; *see also* Exb. #40.

Defendant had notice of Plaintiff's permanent disability, his paralyzed right arm. Defendant knew of this disability from likely the time Plaintiff was interviewed for employment at Defendant in late 2010, or in October 2011 at the latest.[71]

When Plaintiff was interviewed by Michael Howe for employment at Defendant as a liquor delivery helper, Plaintiff told Mr. Howe and Mr. Howe knew that Plaintiff is permanently disabled with a paralyzed arm with a  paralyzed arm.[72] Mr. Howe also directed plaintiff contact Defendant's Human Resources Personnel, Kisha Day, regarding accommodations for his disability.[74] Defendant knew Plaintiff had a permanent disability, a paralyzed arm, in October 2011 at the very latest.[75] Finally, Defendant saw, unlikely for the first time, Dr. Cherian's report regarding Plaintiff's disability, his paralyzed arm, in May 2014 when Plaintiff attached this medical report to his grievance related to his motorized hand truck.[76] For these reasons, Defendant knew since October 2011 at that latest that Plaintiff is permanently disabled with a  paralyzed arm.

### 3. Plaintiff could perform the essential functions of his job as one of Defendant's liquor delivery helpers with or without his recommended reasonable accommodation of a motorized hand truck.

After Plaintiff was hired as one of Defendant's liquor store helpers, Plaintiff performed his job in 2011 with a  manual, non-motorized hand truck. Thereafter, Defendant approved Plaintiff's use of a motorized hand truck; recommended by DORS' as a reasonable accommodation to allow Plaintiff to work optimally and reduce risk of injury, due to Plaintiff's permanent disability, his paralyzed right arm.[77] Plaintiff again began to use a manual hand truck to perform this job in March

---

[71] Exb. #1 at p. 227-231: 1-22, 1-22, 1-22, 1-22, 1-22; *see also* Exb. #4: 58, 66, 69: 1-18, 10-21, 2-15; *see also* Exb. #7; *see also* Exhibit #6 at p. 68-70: 5-21, 1-21, 1; *see also* Exb. #6 at p. 23-26: 1-21, 1-21, 1-21, 1-3.

[72] Exb. #5 at p. 28:2-4; *see also* Exb.  #1 at p. 227-228: 6-22, 1-22; *see also* Exb. #7; *see also* Exb. #6 at p. 68-70: 5-21, 1-21, 1; *see also* Exb. #6 at p. 23-26: 1-21, 1-21, 1-21, 1-3.

[74] Exb. #1 at p. 229-230: 1-22, 1.

[75] Exb. #1 at p. 227-231: 1-22, 1-22, 1-22, 1-22, 1-22; *see also* Exb. #6 at p. 68-70: 5-21, 1-21, 1; *see also* Exb. #6 at p. 23-26: 1-21, 1-21, 1-21, 1-3; *see also* Exb. #10; *see also*  Exb. #7.

[76] Exb. #11; *see also* Exb. #13.

[77] Exb. #1 at p. 288-290: 1-22, 1-22, 1-22; *see also* Exb. #7.

2014, when his motorized hand truck became inoperable. Plaintiff then performed this job with a manual hand truck from March 18th and/or 19th through June 2014.[78] In fact, Plaintiff stated on his application for this job that he is able, with or without reasonable accommodations, to perform the essential functions for the job as a liquor delivery helper.[79]

For these reasons, Plaintiff was able to perform the essential functions of his job as one of Defendant's liquor delivery helpers with or without DORS' recommended reasonable accommodation for him, a motorized hand truck.

> **4. Defendant denied Plaintiff's request for a reasonable accommodation for his disability (his paralyzed right arm) and in this case, for Defendant to fix his motorized hand truck that became inoperable in March 2014**.

Despite Defendant's knowledge of Plaintiff's permanent disability, his paralyzed arm, since October 2011 at the latest, Defendant denied Plaintiff's reasonable accommodation by failing to fix his motorized hand truck and/or authorize the hand truck repair technician to enter the worksite to perform the repairs.[80] Even though Plaintiff notified Defendant that his motorized hand truck became inoperable as early as February 2014, Defendant did not fix Plaintiff's motorized hand truck. In fact, Plaintiff eventually took the motorized hand truck, DORS' recommended reasonable accommodation, for repairs himself.[81]

Plaintiff first notified his supervisor, Jimmy Lundstrom, that his motorized hand truck became inoperable in February 2014.[82] Thereafter, Jimmy Lundstrom immediately notified his supervisor, Michael Howe, that Plaintiff's motorized hand truck became inoperable.[83] Michael

---

[78] Exb. #21; *see also* Exb. #12; *see also* Exb. #15 at p. 161-162: 8-22, 1-11; *see also* Exb. #1 at p. 324: 3-16.
[79] Exb. #2; *see also* Exb. #1 at p. 191-192: 14-22, 1-5.
[80] Exb. #4 at p. 122:1-21; *see also* Exb. #20; *see also* Exb. #5 at p. 126-127, 128:21-22, 1-4, 1-9.
[81] Exb. #1 at p. 340-343: 13-22, 1-22, 1-22, 1-7.
[82] Exb. #1 at p. 316-317: 16-22, 1-6.
[83] Id.

Howe then immediately notified Jason Savage and John Hild that Plaintiff's motorized hand truck became inoperable in March 2014.[84] Michael Howe was awaiting authorization from Jason Savage to direct Plaintiff on what to do regarding this issue (the repairs for the motorized hand truck).[85] Michael Howe never received authorization from Jason Savage regarding the this issue, even though Mr. Howe and Mr. Savage had conversations related to Plaintiff's motorized hand truck that became inoperable in March 2014.[86] Instead of addressing this issue, and at the direction of legal counsel, Defendant requested that Plaintiff provide Defendant with additional medical documentation related to his disability and need for his reasonable accommodation.[87] As stated above, since October 2011 at the latest, Defendant knew Plaintiff had a permanent disability with his paralyzed arm.[88] Moreover, as stated above, Defendant knew of DORS' recommended reasonable accommodation for Plaintiff's employment at Defendant because of his permanent disability, a motorized hand truck.[89]

Further, John Hild, knew of Plaintiff's inoperable motorized hand truck in March 2014, he stated, "[Defendant] failed to afford Plaintiff a reasonable accommodation under the ADA."[91] John Hild then stated if Plaintiff wanted to, Plaintiff could immediately have his motorized hand truck fixed, by either having someone to come to Defendant to fix the hand truck or Plaintiff could take it to be repaired himself.[92]

---

[84] Id. at p. 316 -317: 16-22, 1-22; see also Exb. #5 at p. 9:1-18.
[85] Id. at p. 319- 321: 21-22, 1-22, 1-19.
[86] Exb. #6 at p. 70-71: 2-21, 1-17.
[87] Exb. #6 at p. 83-85: 15-21, 1-21, 1-16.
[88] Exb. #6 at p. 68-70: 5-21, 1-21, 1; see also Exb. #6 at p. 23-26: 1-21, 1-21, 1-21, 1-3; see also Exb. #1 at p. 227-228 6-22, 1-22.
[89] Exb. #4 at p. 122:1-21 see also Exb. #20; see also Exhibit #6 at p. 68-70: 5-21, 1-21, 1; see also Exb. #6 at p. 23-26: 1-21, 1-21, 1-21, 1-3; see also Exb. #12.
[91] Exb. #16; see also Exb, #26; see also Exb. #5 at p. 9:1-18.
[92] Exb. #12.

Despite these facts, Defendant's HR department insisted that Plaintiff provide Defendant with additional medical documentation related to his permanent disability, his paralyzed arm, and his need for his reasonable accommodation, the motorized hand truck.[93] In fact, following the July 2014 grievance meeting related to the repairs of Plaintiff's inoperable motorized hand truck, Mr. Savage insisted that Plaintiff will provide Defendant with additional medical documentation related to his disability.[94] As stated above, Defendant had this documentation in October 2011.[95] Thus, Defendant had no need for additional medical documentation related to Plaintiff's permanent disability, his paralyzed arm, and his reasonable accommodation, the motorized hand truck.

### a. The reasonable accommodation to fix Plaintiff's inoperable motorized hand truck in 2014 did not place an undue hardship on Defendant.

Plaintiff's motorized hand truck, his reasonable accommodation for his disability under the ADA, cannot impose an undue hardship on Defendant. *See* <u>Graffius v. Shinseki</u>, 672 F. Supp. 2d 119 (D.D.C. 2009). Here, Plaintiff's hand truck was $424.29 for repairs, which is a reasonable amount and not an undue hardship for Defendant, which is a multi-million-dollar business.[96] Thus, the repairs to Plaintiff's motorized hand truck did not impose any undue hardship on Defendant and Defendant should have timely repaired Plaintiff's hand truck, or allow Plaintiff to contact Defendant's mechanic to fix it.

---

[93] Exb. #4 at p. 102-103, 146-148:10-21, 1-20, 15-21, 1-21, 11-20; *see also*  Exb. #20; *see also* Exb. #12; *see also* Exb. #6 at p. 83-85: 15-21, 1-21, 1-16.
[94] Exb. #23; *see also* Exhibit #6 at p. 117-119: 10-21, 1-21, 1-16.
[95] Exb. #7; *see also* Exb. #1 at p. 282:4-13; *see also* Exhibit #4 at p. 122:1-21 *see also* Exb. #20; *see also* Exb. #6 at p. 68-70: 5-21, 1-21, 1; *see also* Exhibit #6 at p. 23-26: 1-21, 1-21, 1-21, 1-3.
[96] Exb. #1 at p. 342-343: 2-22, 1-11; *see also* Exb. #21; *see also* Exb. #27.

**B.** **The undisputed recorded evidence shows that Plaintiff established his relation claim against Defendant**.

Employers may not retaliate against employees who file complaints of disability discrimination under the ADA. Smith v. Dist. of Columbia, 430 F.3d 450, 454–55 (D.C. Cir. 2005) (citing 42 U.S.C. § 12203(a). In analyzing Plaintiff's retaliation claim, the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *See* Id. (citing Brown v. City of Tucson, 336 F.3d 1181, 1186–87 (9th Cir.2003); also citing New England Health Care Employees Union v. R.I. Legal Servs., 273 F.3d 425, 429 (1st Cir.2001); also citing Rhoads v. FDIC, 257 F.3d 373, 391–92 (4th Cir.2001).

Under the McDonnell-Douglas framework, the plaintiff must establish the three elements of a prima facie case of retaliation: first, that Plaintiff "engaged in protected activity"; second, that Plaintiff "was subjected to adverse action by the employer"; and third, that "there existed a causal link between the adverse action and the protected activity." Smith, 430 F.3d 450 at 455 (citing Jones v. Wash. Metro. Area Transit Auth., 205 F.3d 428, 433 (D.C.Cir.2000) (internal quotation marks and citations omitted). "Such a showing raises 'a rebuttable presumption of unlawful discrimination' and shifts to the defendant the burden to 'rebut the presumption by asserting a legitimate, non-discriminatory reason for its actions.' " *See* Id. (citations omitted). If the defendant does so, "the McDonnell[-]Douglas framework disappears, and we must decide whether a reasonable jury could infer intentional discrimination" from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were discriminatory or that the non-discriminatory justification was pretextual. Smith, 430 F.3d 450 at 455 (citing Murray v. Gilmore, 406 F.3d 708, 713 (D.C. Cir. 2005).

**1. Plaintiff engaged in a protected activity by reporting his safety concerns to deliver liquor to Defendant's accounts, Wonderland Ballroom and A N D, because of the dangers of delivering to these accounts with Plaintiff's disability, and the accounts' OSHA violations; lack of handrails for the liquor delivery.**

Plaintiff engaged in protected activity when he reported his safety concerns for delivering to Wonderland Ballroom and A N D because of the accounts' OSHA violations. *First*, the accounts must comply with federal law; the regulations pursuant to OSHA, and opposing such violation is protected activity under the law. Brady v. United States Capitol Police, 200 F. Supp. 3d 208 (D.D.C. 2016)(citing Moore v. Office of the Architect of the Capitol, 828 F.Supp.2d 254, 257 (D.D.C.2011)( "To oppose a discriminatory employment practice, conduct that is statutorily protected, plaintiff is required to *communicate* to [her] employer that [she] believes the employer's conduct is, in fact, discriminatory.") *Second*, Plaintiff's circumstances are unique and constitute protected activity. Defendant knows Plaintiff's disability, and DORS' reasonable accommodation recommended for him (the motorized hand truck) specifically for Plaintiff to climb up and down stairs for his job as Defendant's liquor delivery helper. Plaintiff's reported safety concerns regarding Wonderland Ballroom and A N D is not only protected activity for any person for under the law, but Plaintiff's circumstances (his documented disability under the ADA) lend greater support to his engagement in this protected activity.

**2. Defendant's adverse employment action against Plaintiff; failing to fix his inoperable motorized hand truck (DORS' recommended reasonable accommodation for Plaintiff to perform his job as Defendant's liquor delivery helper) when it became inoperable in February 2014.**

For an action to be considered an "adverse employment action" the action must have "materially affected… "materially affected ... the terms, conditions, and privileges of [his] employment." Blackwell v. SecTek, Inc., 61 F. Supp. 3d 149, 161 (D.D.C. 2014)(citing Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009)). Moreover, an employee must "experience[ ]

materially adverse consequences affecting the terms, conditions, or privileges of employment …

such that a reasonable trier of fact could find objectively tangible harm." Douglas, 559 F.3d 549

at 552. (citing  Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C.Cir.2002)(also citing Holcomb v.

Powell, 433 F.3d 889, 902 (D.C. Cir. 2006).

Here, clearly, Defendant's failure to fix Plaintiff's motorized hand truck when it became

inoperable in February 2014 is a tangible harm that affects the conditions of Plaintiff's

employment as a liquor delivery helper. Plaintiff has a documented disability under the ADA. For

this disability and so he can perform his job as Defendant's liquor delivery helper, DORS

recommended Plaintiff's reasonable accommodation of a motorized hand truck. Thus, Plaintiff's

inability to use the reasonable accommodation DORS provided him for his employment at

Defendant. Further, Defendant knew Plaintiff's motorized hand truck was inoperable within a

week of it becoming inoperable in February 2014. However, Defendant never took action to fix it.

Instead, Defendant requested to Plaintiff that he provided it with additional medical documents

related to Plaintiff's disability and his need for his reasonable accommodation[97]; the motorized

hand truck. Plaintiff ended up taking his motorized hand truck to be repaired in late June 2014

after Defendant's HR department failed to follow up with him after the Vice President of

Operations, John Hild, in March 2014 indicated to Defendant's HR department that; (1) Plaintiff

could either have a mechanic come on site to fix the hand truck; or (2) Plaintiff could get the hand

truck fixed himself.[98]

---

[97] Exb. 20; *see also* Exb. 10; *see also* Exb. #4 at p. 122:1-21.
[98] Exb. #12; *see also* Exb. #15 at p. 161-162: 8-22, 1-11; *see also* Exb. #1 at p. 324: 3-16; *see also* Exhibit #6
at p. 68-70: 5-21, 1-21, 1; *see also* Exb. #6 at p. 23-26: 1-21, 1-21, 1-21, 1-3

For these reasons, Defendant's failure to fix Plaintiff's motorized hand truck and follow up with Plaintiff regarding its repairs after it became inoperable in February 2014 constitutes Defendant's adverse employment action towards Plaintiff.

### 3.  A casual relation exists between Plaintiff's protected activity and Defendant's adverse employment action.

For purposes of establishing a prima facie case of retaliation, and specifically the causal link between the protected activity and the adverse employment action, "[t]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time." Hamilton v. Geithner, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012) *Id.* (citation and internal quotation marks omitted)(citing Singletary v. District of Columbia, 351 F.3d 519, 525 (D.C.Cir.2003). Although the Supreme Court has cited circuit decisions suggesting that in some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation, neither the Supreme Court nor this court has established a bright-line three-month rule. Hamilton, 666 F.3d 1344 at 1357-58 (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74, 121 S. Ct. 1508, 149 L.Ed.2d 509 (2001).

### a.  The circumstances here show a temporal proximity between Plaintiff's protected activity and Defendant's adverse employment action and therefore there is a causal link exists.

Defendant's adverse employment action towards Plaintiff (its failure to fixed Plaintiff's motorized hand truck which became inoperable in February 2014) is casually linked to Plaintiff's engagement in protected activity (Plaintiff's reported safety concerns with Defendant's accounts, Wonderland Ballroom and A N D, and these accounts' OSHA violations.

After Plaintiff reported his safety concern of Wonderland Ballroom's OSHA violation in August 2013, and Wonderland Ballroom's severance of its business relationship with Defendant

on or about August 30, 2013,[99]Plaintiff then went out of work from early September 2013 through sometime in November 2013.[100] After Plaintiff reported his safety concern regarding Wonderland ballroom in early August 2013, for the first time since Defendant received DORS' recommendation for Plaintiff's motorized hand truck in October 2011, Defendant asked Plaintiff to provide it with additional medical documentation related to Plaintiff's disability and his need for the reasonable accommodation.[101] Moreover, Defendant indicated its intention to disciplinary action against Plaintiff for this reported safety concern. The reason for the lack of disciplinary action is because Plaintiff was out of work from early September 2013 and did not return until sometime in November 2013, Plaintiff reported his safety concern to Defendant regarding A N D's OSHA violations in late November 2013. Plaintiff indicated at this time, if his safety concerns are not addressed related to A N D, like he did for Wonderland Ballroom because his safety concerns were not addressed then, he will file an OSHA Complaint against A N D.

Because of Plaintiff's protected activity concerning his safety concerns with Defendant's accounts, Defendant took action against him. Specifically, Plaintiff failed to fix his motorized hand truck when it became inoperable in February 2014. When Defendant's Vice President of Operations, John Hild, indicated to Defendant's HR department in March 2014 that Plaintiff could have a mechanic come on site to fix his hand truck or get in fixed himself, Defendant took an alternative route.[102] Instead of following up with Mr. Hild regarding this matter, Defendant's HR personnel again requested that Plaintiff provide them with additional medical documentation

---

[99] Exb. #30.
[100] Exb. #1 at p. 124-125: 13-21, 1-15; *see also* Exb. #37.
[101] Exb. #31; *see also* Exb. #6 at p. 50-51: 1-21, 1-21.
[102] Exb. #12; Exb. #4 at p. 102-103, 146-148:10-21, 1-20, 15-21, 1-21, 11-20; *see also*  Exb. #20; *see also* Exb. #6 at p. 83-85: 15-21, 1-21, 1-16.

related to his disability and his need for the reasonable accommodation, before Defendant will take action to fix Plaintiff's motorized hand truck.

Defendant's failure to fix Plaintiff's motorized hand truck in 2014 was the first opportunity Defendant had to take adverse employment action towards him. Plaintiff met the legitimate expectations of Defendant throughout his employment at Defendant[103], and therefore suspension or termination, with or without cause, was seemingly unwarranted.

For these reasons, there is causal connection between Plaintiff's protected activity (his reported safety concerns of the OSHA violations of Defendants accounts, Wonderland Ballroom and A N D) and Defendant's adverse employment action towards him (Defendant's failure to fix Plaintiff's motorized hand truck in 2014 and repeated requests for Plaintiff to submit additional medical documentation related to his disability and need for his reasonable accommodation; his motorized hand truck.

### 4. Plaintiff established his retaliation claim under the McDonnell-Douglas Framework.

Plaintiff established his retaliation claim against Defendant under the McDonnell-Douglas framework. Any "legitimate non-discriminatory" reason Defendant may assert is unwarranted. Instead, it demonstrates pretext for its retaliatory action towards Plaintiff.

### a. Defendant's legitimate non-discriminatory reasons for Defendant's failure to fix Plaintiff's motorized hand truck when it became inoperable in February 2014.

Defendant's reason for its failure to fix Plaintiff's motorized hand truck, and its failure to follow up with John Hild regarding Plaintiff being able to have a mechanic fix his hand truck on site or get the hand truck repaired himself, is no reason at all. Defendant contends that Plaintiff's failure to provide them with additional medical documentation related to his disability and need

---

[103] Exb. #3 at 34-35: 11-21, 1-17.

for his reasonable accommodation, following Defendant's request for this in August 2014 and April 2014, warrants Defendant's failure to fix Plaintiff's motorized hand truck or follow up with John Hild regarding the same.

Moreover, Defendant may contend since Plaintiff used a manual hand truck for his employment at Defendant for approximately a little over a year before Plaintiff received his motorized hand truck.[104] Therefore, given this fact, Plaintiff needs to submit additional medical documentation to defendant regarding his disability and need for his reasonable accommodation, a motorized hand truck.  However, HR manager, Ms. Regina Marks email to Kisha Day and Jason made clear that: "Michael, mentioned that there is more to the story regarding Mr. Marks' request for accommodation, and his paralyzed hand.". The only other unresolved issues with Plaintiff at the time was his reporting of OSHA violation by Defendant customers.

### b. Defendants' legitimate non-discriminatory reasons stated above are pretext for its retaliatory conduct towards Plaintiff.

First, Defendant had the medical documentation it needed to show that Plaintiff's reasonable accommodation provided to him by DORS, is a permanent accommodation for Plaintiff's permanent disability, his paralyzed arm. Defendant knew from the time of hire Plaintiff had a paralyzed arm. Thus, it is illogical to believe DORS' recommendation for Plaintiff to perform his job at Defendant, a motorized hand truck, is a 'temporary' reasonable accommodation.

Second, Defendant's anticipated contention Plaintiff used a manual hand truck for approximately a year prior to receiving his reasonable accommodation is no reason at all. Plaintiff even stated on his application, which is in line with the ADA, Plaintiff can perform the essential functions of his job "with or without" a reasonable accommodation.[105] Defendant indicated to

---

[104] Exb. #1 at p. 288-289: 10-21, 1-9; *see also* Exb. #1 268-269, 272-273: 1-21, 1-21; *see also* Exb. #7.
[105] Exb. #2.

Plaintiff at the time of his interview what the job duties as a helper would entail, and he did not dispute that he could perform the essential functions of this position with or without a reasonable accommodation. Despite this fact, at DORS' recommendation, and because Plaintiff has a documented disability under the ADA (Plaintiff's paralyzed arm), Plaintiff was provided the reasonable accommodation of a motorized hand truck to perform his job at Defendant. Thus, it is irrelevant Plaintiff performed his job at the time before he received his reasonable accommodation with a manual hand truck.

For these reasons, Defendant's reasons or anticipated legitimate non-discriminatory reasons for its failure to fix Plaintiff's motorized hand truck, and request additional medical documentation related thereto, is pretext for its retaliation against him. Therefore, Defendant is liable to Plaintiff for his retaliation claim.

## IV.    CONCLUSION

Based upon the legal standard and the undisputed record in this case, Plaintiff is entitled to summary judgment against Defendant on his failure to accommodate claim in violation of the ADA and retaliation claim.

*First*, Plaintiff is entitled to summary judgment on his failure to accommodate claim in violation of the ADA against Defendant because: (1) Plaintiff has a disability under the Americans with Disabilities Act (ADA); (2) Defendant had notice of Plaintiff's permanent disability; Plaintiff's paralyzed arm;  (3) Plaintiff can perform the essential functions of his job as one of Defendant's liquor delivery helpers with or without his recommended reasonable accommodation of a motorized hand truck; and (4) Defendant denied his request for a reasonable accommodation for his disability (his paralyzed right arm); to fix Plaintiff's motorized hand truck that became inoperable in February 2014 Instead, at a time shortly after Plaintiff's motorized hand truck

became inoperable, Defendant requested that Plaintiff provide Defendant with additional medical documentation related to his permanent disability and need for his reasonable accommodation. Defendant knew Plaintiff was permanently disabled since October 2011 at the latest, and more likely, at the time Plaintiff was interviewed for his employment at Defendant as a liquor delivery helper.

*Second*, Plaintiff is entitled to summary judgment on his retaliation claim because: (1) Plaintiff engaged in protected activity (his reported safety concerns with his delivery to Defendants' accounts, Wonderland Ballroom and A N D, both of which comprised OSHA violations; (2) Defendant's adverse employment action towards Plaintiff (Defendant's failure to fix Plaintiff's motorized hand truck when it became inoperable in February 2014, and its need to request Plaintiff to provide it with additional medical documentation despite John Hild's proposals to allow Plaintiff to fix his hand truck himself or have a mechanic fix it for him March 2014; and (3) There is a causal link between Plaintiff's protected activity and Defendant's adverse employment action against him. Moreover, Defendant's contended or anticipated to be contended legitimate non-discriminatory reasons for its adverse employment action is pretext.

WHEREFORE, Plaintiff respectfully requests for this honorable court to: (1) grant Plaintiff's motion for summary judgment against Defendant; (2) grant Plaintiff summary judgment on his failure to accommodate claim in violation of the ADA and his retaliation claim  against Defendant; and (3) grant Plaintiff such other relief the cause may require.

Respectfully submitted,

/s/ *John J. Leppler*

_____
John J. Leppler, Esq. #19736
George A. Rose, Esq. #26086

Rose Law Firm, LLC
200 E. Lexington St., Suite 1305
Baltimore, Maryland 21202
Tel: (410) 727-7555
Fax: (443) 320-0962
Attorneys for Plaintiff Malcolm Marks

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 27th day of February 2017, a copy Plaintiff Malcolm Marks's motion for summary judgment against the Defendant, Washington Wholesale Liquor Company, LLC. was served by electronic mail to this court e-file on:  Michele A. Coyne, *pro hac vice*, Kristina C. Hammond, *pro hac vice*, and Lisa Dayan, DC Bar No. 438363,  and the law firm, Kauff McGuire & Margolis LLP, 950 Third Avenue – Fourteenth Floor, New York, NY 10022, telephone:  (212)  644-1010,  coyne@kmm.com,  hammond@kmm.com,  dayan@kmm.com, attorneys for Defendant Washington Wholesale Liquor Company LLC.


Respectfully submitted,

/s/ *John J. Leppler*

_____

John J. Leppler, Esq.