**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MALCOLM MARKS,

     Plaintiff,

       v.                                                                 Civil Action No.  15-1714 (JEB)

WASHINGTON WHOLESALE LIQUOR
COMPANY LLC,

     Defendant.

<u>**MEMORANDUM OPINION**</u>

     Plaintiff Malcolm Marks asserts that his employer – Washington Wholesale Liquor

Company – violated the Americans with Disabilities Act in two separate ways when it delayed

fixing the motorized hand truck that he used to make deliveries.  More specifically, he contends

that Defendant's stalling both denied him a reasonable accommodation for his right-arm

paralysis and served as retaliation for his earlier reporting of safety issues at two delivery

locations.  Defendant forcefully rejoins that the brief delay was appropriate and unrelated to any

safety reporting.  Now, on the parties' Cross-Motions for Summary Judgment, the Court agrees

that the evidence cannot support either of Plaintiff's claims and will thus grant Defendant's

Motion.

**I.**      **Background**

     Because the Court grants Defendant summary judgment, it sets out the underlying facts in

the light most favorable to Plaintiff.  In so doing, though, it only credits facts that Marks has

supported with evidence in the record, relying in particular on his deposition testimony.  The

Court offers him this generous reading despite the fact that Marks utterly failed to comply with

Local Civil Rule 7(h), which requires that "[e]ach motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue" and that any opposition to such a motion "be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  Marks never filed such a statement with either his Motion or his Opposition.

The Court could penalize this violation by "assum[ing] that facts identified by [WWL] in its statement of material facts are admitted."  Id.; Murray v. Amalgamated Transit Union, 183 F. Supp. 3d 6, 15-16 (D.D.C. 2016) (explaining use of "may" in prior version of LCvR 7(h) implies discretion).  Indeed, as this Circuit has recognized, enforcing this rule assists a district court's ability "to maintain docket control and to decide motions for summary judgment efficiently and effectively."  Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 150 (D.C. Cir. 1996).  To ensure that its decision is based on the merits, the Court nevertheless largely chooses not to resolve such facts against Marks here.

Having chosen to plot this lenient course, it will nevertheless not parrot any unsupported allegations or misrepresentations that are found solely in his briefing – most notably, the several instances where he self-servingly misrepresents key dates – nor will it ignore those of WWL's facts that Marks has failed to refute with any record citations.  Although not ultimately relevant to liability, the Court also notes some blatant misrepresentations of what certain evidence on damages actually says.  For example, Marks claims that he underwent two shoulder surgeries because of WWL's denial of his reasonable accommodation in 2014.  See ECF No. 35 (Marks Reply) at 24.  The evidence he cites in support of this allegation, however – both in his briefing and at the hearing – clearly and unambiguously states that he suffered these injuries after a slip

and fall at work on January 6, 2015, while he was using his motorized hand truck.  <u>See</u> ECF No.

32 (Motion), Exhs. 38-39 (describing how Marks "<u>started</u> to experience left shoulder pain" after

he slipped and fell in the snow on January 6, 2015) (emphasis added).

With these parameters set, the Court first takes up the underlying facts of this dispute,

breaking this discussion up into sections about the origins of Marks's disability, his acquisition

and use of a motorized hand truck while working for Defendant, his later reporting of missing

handrails at two delivery locations, and the hand truck's eventual breakdown and repair in 2014.

A final procedural section then details the history of this litigation.

A.  <u>Factual</u>

1.  *Disability (2006)*

In 2006, well before he went to work for Defendant, Marks went through a life-altering

event when he was shot multiple times in his face, right arm, hip, and buttocks.  <u>See</u> Mot., Exh. 7

(Occupational Therapy Worksite Assessment) at 3.  The resulting injuries forced him to receive a

prosthetic chin and to endure a colon resection.  <u>Id.</u>  As particularly pertinent here, they also left

him with paralysis in his right arm.  <u>Id.</u>

2.  *Hiring and Motorized-Hand-Truck Acquisition (2010-2012)*

Four years later, Marks applied for a position as a distribution "helper" at WWL.  <u>See</u>

Mot., Exh. 2 (Application) at 1.  Helpers assist WWL drivers with the loading, off-loading, and

delivery of heavy liquor boxes to customers.  <u>See</u> Mot. at 5-6.  Despite the obvious physical

demands of such a job, Marks indicated on his application that he could do this work without any

accommodations for his disability.  <u>See</u> Application at 2 (checking box indicating no request for

accommodation).  When the Company first interviewed him, moreover, Marks reaffirmed that he

would not need any special assistance despite his right-arm paralysis.  <u>See</u> Mot., Exh. 1

(Deposition of Malcolm Marks 1) at 226:12-227:5.  Marks's size and strength likely helped

mitigate his injury.  See Mot., Exh. 38 (Independent Medical Evaluation) at 3 (describing Marks

as 6'6'' and 270 lbs.).

His prediction rang true for his first 14 months at WWL.  In short, Marks successfully

performed his work from August 2010 onward without any special equipment.  See Marks Dep.

1 at 269:3-270:9.  He simply used the same type of manual hand truck that Defendant provided

to all its helpers without apparent issue.  Id.; see also ECF No. 33 (Cross-Motion), Exh. 2

(Deposition of Malcolm Marks 3) at 110:2-10 (setting start date).

In mid-2011, though, Plaintiff began consulting with the Maryland State Department of

Education's Division of Rehabilitation Services about acquiring special equipment to help him

be more efficient.  See Marks Dep. 3 at 143:7-144:2.  Although he had been a DORS client since

2009, Marks first mentioned this to a WWL Human Resources representative – Kisha Day – in

May 2011, telling her specifically that he was investigating getting a motorized hand truck

through the program.  See ECF No. 33 (Defendant's Statement of Material Facts) (SOF), ¶ 11;

see also Marks Dep. 3 at 144:17-144:20.  Day responded that she would need supportive medical

paperwork detailing why a disability accommodation would be needed before approving the use

of such specialized equipment.  See Marks Dep. 3 at 144:17-145:8; Mot., Exh. 10 (Email from

Kisha Day to Malcolm Marks on Nov. 1, 2011) (relating discussion from May and request for

supportive paperwork).  Marks, in turn, promised to get her the necessary forms soon, but she

heard nothing more from him for approximately five months.  See SOF, ¶ 12.

On October 20, 2011, Marks finally wrote to Day again to discuss the motorized hand

truck.  See Mot., Exh. 7 (Letter from Marks to Kisha Day on Oct. 20, 2011); Marks Dep. 1 at

282:17-22 (acknowledging no information to suggest DORS contacted the Company prior); Nov.

1, 2011, Email from Day at 1 (indicating this was first she heard of the issue since May); Mot.,
Exh. 9 (Email from Kisha Day to Jason Savage on Oct. 20, 2011).  He specifically requested a
"reasonable accommodation" in the form of "a secure space to lock up and charge a Motorized
Hand Truck" in his letter.  See Oct. 20, 2011, Marks Letter at 2; Marks Dep. 3 at 129:17-21,
144:17-145:8.  In addition, he attached a DORS occupational-therapy assessment from June
2011, indicating that he would benefit from using this equipment.  See Oct. 20, 2011, Marks
Letter at 3.  Around the same time, too, DORS reached out to Day to confirm that it would
purchase this hand truck "to assist him in performing his job duties more efficiently."  Mot., Exh.
8 (Email from Matthew Jackson to Kisha Day on Oct. 20, 2011) at 1.  It also affirmed that Marks
would be responsible for the hand truck, but asked that the Company provide a place for it to "be
locked up and plugged in when not in use."  Id. at 2.

As Marks was out on leave in October, Day took roughly 11 days to respond, eventually
letting him know at the start of November that his request for an accommodation was under
review.  See Nov. 1, 2011, Email from Day at 1.  She further asked that Marks meet with her and
her supervisor, Jason Savage, upon his return to work to move this process forward.  Id.  In
particular, Day wanted to speak with him about the need for the accommodations he was
requesting.  Id.  She got no response from Marks.  See SOF, ¶ 22; ECF No. 33-55 (Declaration
of Keisha Day), ¶ 5; ECF No. 33-56 (Declaration of Jason Savage), ¶ 11.

A month later, on December 6, Marks picked up his new hand truck from DORS and, in
February 2012, showed up with it upon his return to work.  See SOF, ¶ 23.  He never reached out
to anyone at WWL to finish an ADA-related interactive process for his accommodation request
in the interim, nor did he provide any further supportive documentation about the scope of his

limitations.  Id., ¶ 22.  His supervisors at WWL nevertheless gave him a locked space and electrical access for the handcart.  Id., ¶ 24; Marks Dep. 3 at 195:16-196:14, 200:10-21.

Not long after, Marks discovered that he also needed to charge the hand truck while he was out doing his deliveries, not just at the end of the day, as he had initially requested.  See Marks Dep. 3 at 201:4-10.  He thus informed Michael Howe, his immediate supervisor, that the cigarette lighter in his truck was broken and needed to be fixed.  Id. at 201:11-13.  While it took some time for a third-party shop mechanic, referred to as "Kenny," to get the requisite part, the truck's charger was up and running again on May 18, 2012, and Marks had just one half-day where he was forced to use a manual hand truck after the battery on his motorized one died.  See Marks Dep. 3 at 208:18-209:12, 221:3-17; see also Mot., Exh. 30 (2011 Grievance Reporting Form) at 2 (noting half-day without hand truck); SOF, ¶ 33.

3.  *Safety Reporting (Summer/Fall of 2013)*

More than a year went by before, in June 2013, the central issue related to Marks's retaliation claim popped up between him and WWL.  While out on a delivery at the Wonderland Ballroom, Plaintiff found himself in a tough situation.  See Marks Dep. 3 at 236-43, 250:4-13. Steep stairs that he needed to climb down to a storage area had no handrail.  Id.  Marks, as a result, became fearful that he might slip and fall.  Id. at 238:2-6, 241:7-14.  He immediately spoke with his driver, who told him to call their secondary supervisor – Karl Fisher – to lodge a complaint about the missing handrail.  Id. at 238:5-11.  Marks did so and was instructed by Fisher to leave the liquor upstairs, rather than risk going down the stairs.  Id. at 237:1-10, 241:22-7.

After that, Marks returned to make other deliveries at Wonderland, but there is no indication that he was ever asked by WWL to go down those stairs again.  Id. at 258:8-259:22.

In fact, he understood that he had been instructed by Fisher <u>not</u> to descend them even if the

customer asked that he do so.   <u>Id.</u> at 259:20-260:6.   Marks, moreover, testified that he worried

that he would get in trouble if he attempted such a maneuver.   <u>Id.</u>   Defendant also did not waver

on its instruction that he not do so, even after Wonderland began rejecting deliveries as a result.

<u>Id.</u> at 261.   Instead, it continued to try to push Wonderland to install the required handrail,

conducting two onsite visits to this end.   <u>See</u> Mot., Exh. 6 (Deposition of Jason Savage) at 35:6-

15, 39:12-40:9; ECF No. 33-5 (Deposition of Michael Howe) at 42:3-44:14; Cross-Mot., Exh. 32

(Aug. 30, 2013, Letter from Karl Fisher).

Despite these efforts by WWL, Wonderland ultimately refused to install the handrail and

instead acquiesced to upstairs deliveries.   <u>See</u> Aug. 30, 2013, Fisher Letter (describing site

visits).   Unsatisfied with this resolution, on August 15, 2013, Marks filed a formal complaint

against Wonderland – not WWL – with the Occupational Safety and Health Administration in

the name of his driver, Reggie Cromer.   <u>See</u> Marks Dep. 3 at 264:7-16; 273:7-19.   He also told

Fisher several times after this that he had filed this complaint, and Fisher consistently told him

that it was then "between you and OSHA."   <u>Id.</u> at 264:17-265:22.   In another instance, Fisher

told him that "he really didn't care" about Marks's lodging of the complaint.   <u>Id.</u> at 265:18-22.

Two weeks later, OSHA contacted Wonderland, and the client immediately responded by

telling WWL's sales team that it would no longer be doing business with the Company.   <u>See</u>

Savage Dep. at 50:8-51:21; Mot., Exh. 35 (Email from John Hild on Aug. 29, 2013) at 1.   That

same day, on August 29, 2013, the WWL operations director, John Hild, wrote an email to

Human Resources, asking what "option and discipline [choices]" they had with regard to

Marks's filing of the OSHA complaint.   <u>See</u> Aug. 29, 2013, Hild Email; Savage Dep. at 44:6-19.

Human Resources commendably responded that no action could be taken against such an

employee for reporting a safety issue.  <u>See</u> Savage Dep. at 44:6-19.  Although no one at the Company subsequently mentioned the matter to Marks, he suspected that people at WWL might be upset about his decision to file the OSHA complaint, given that Wonderland ultimately terminated its account.  <u>See</u> Marks Dep. 3 at 270:7-20.

From September through November 2013, Marks was briefly out on leave for an unrelated issue stemming from a car accident.  <u>See</u> Mot. at 11, 27; Marks Dep. 1 at 124:13-125:18; SOF, ¶ 18.  After his return, he had another missing-handrail concern with a different customer, AND.  <u>See</u> Marks Dep. 3 at 278:2-13; Savage Dep. at 53:12-54:7.  He again complained directly to its onsite manager, who, unlike the Wonderland manager, told him that he should just leave the product upstairs.  <u>See</u> Marks Dep. 3 at 278:14-22.  Marks did so, but alerted his own supervisor to the problem at the end of his work day around November 26.  <u>Id.</u> at 279:4-7; Mot., Exh. 32 (Email from James Lundstrom on November 27, 2013).  He further indicated that he would call OSHA again if a handrail did not get installed.  <u>See</u> Marks Dep. 3 at 279:11-17.  This time, however, Marks never filed any formal complaint with OSHA or even a grievance with WWL about the issue.  <u>Id.</u> at 280:10-12.

### 4.  *Hand-Truck Breakdown & Repair*

After November 2013, almost four quiet months passed until Marks's motorized hand truck broke down on March 18, 2014.  <u>See</u> Marks Dep. 3 at 44:1-16 (confirming March 2014); ECF No. 33-3 (Deposition of Malcolm Marks 2) at 46:10-16; <u>see also</u> Marks Dep. 3 at 161:15-18 (confirming date); 325:15-19 (confirming date); Mot., Exh. 12 (Email from Michael Howe on May 13, 2014).  How the Company responded to this event forms the crux of his reasonable-accommodation claim.

Marks immediately brought this issue to the attention of one of his supervisors, Jimmy Lundstrom, and asked whether he could have a service technician come onsite to fix it.  See Mot., Exh. 22 (2014 Grievance Reporting Form) at 2.  Lundstrom promised to ask Howe to approve a repair.  See Marks. Dep. 1 at 319:20-320:19; Mot., Exh. 3 (Deposition of James Lundstrom) at 51:1-19.  Howe, though, informed Lundstrom that the shop mechanic, Kenny, could not work on Marks's equipment because it did not belong to WWL.  See SOF, ¶¶ 63-64; see also May 13, 2014, Howe Email at 1.  Howe promised that he would look into the issue further and get back to Lundstrom on how to proceed.  See SOF, ¶¶ 63-64.

The next day – March 19 – Marks asked Howe directly about the possibility of having Kenny work on his hand truck before he set out for his daily deliveries.  Id., ¶ 65.  Howe, again, said that Kenny could not do the repairs, but also reiterated that he would look into another solution.  Id.  Marks, in turn, told Howe that he was fine with paying for the repairs himself because he owned the hand truck; he just wanted the Company to let him have a service technician come onsite to fix it.  See May 13, 2014, Howe Email at 1; SOF, ¶ 65.  Howe then emailed Savage, Day, and Hild (the general director of operations) the same day to let them know that Marks had asked about getting his equipment fixed.  See SOF, ¶ 66.  He also sought their guidance on whether he should have Kenny look at it.  Id.; Mot., Exh. 16 (Emails between Howe and Savage on March 19, 2014) at 1.

This coterie of Savage, Day, and Hild exchanged two emails that day about how the Company should respond to Marks's request.  See Mot., Exh. 16.  Savage initially replied that, as a first thought, WWL was not responsible for these repairs, but offered that the group should probably have some discussion about it.  See Mar. 19, 2014, Savage Email; SOF, ¶ 66.  Hild noted in a brief second email that they had yet to grant Marks an accommodation and had not

provided the equipment in question to him.  <u>See</u> Mar. 19, 2014, Hild Email.  In the end, though,

the group agreed that they should speak with legal counsel before getting back to Marks about

whether they would fix the hand truck.  <u>See</u> SOF, ¶ 66.  They also resolved that they "needed to

meet with [Marks to] . . . get an understanding of what he was asking for specifically . . . [and] to

gain the appropriate medical documentation so we could see what accommodations could be

made."  <u>Id.</u>; Savage Dep. at 84:4-85:7.

     About a week later, around March 26 or 27, Marks asked Howe again about whether a

solution had been found, and Howe told him that Human Resources had not yet gotten back to

him about it.  <u>See</u> SOF, ¶ 68; Marks Dep. 1 at 321:1-22.  Marks responded that he just wanted to

have a specialized mechanic come to WWL to fix it at his personal expense.  <u>See</u> May 13, 2014,

Howe Email at 1.  Howe, again, told him to sit tight while he followed up on the issue, and he

immediately wrote to Savage and Hild on March 27 to ask whether the repair was in fact WWL's

responsibility.  <u>See</u> Mot., Exh. 17 (Email from Howe on March 27, 2014) at 1.

     Within a day, Day responded to Howe that she would be discussing the matter with

Marks directly.  <u>See</u> May 13, 2014, Howe Email at 1-2.  This meeting happened a few days later

on April 1.  <u>See</u> Marks Dep. 3 at 154:22-155:10.  Day, as before, reminded Marks that the

Company would require medical paperwork to help identify his need for what she described as

the "additional accommodation" to take care of repairs on his electric hand truck.  <u>Id.</u> at 155:13-

19.  Marks responded that he just wanted to have a service technician come out to Washington

Wholesale to repair it (with no charge to Defendant) or, if that did not work out, to take it to a

shop to get it repaired at his own expense.  <u>See</u> SOF, ¶ 70; Mot, Exh. 20 (Email from Kisha Day

on April 1, 2014).  He also agreed to visit his doctor to get some documentation tying his

physical limitations to his need for the motorized equipment, and he explained to at least one

other supervisor that he understood that he needed to get a doctor's note before WWL would actually pay for any repairs.  See Marks Dep. 3 at 155:13-19; SOF, ¶ 71; Marks Dep. 2 at 46:6-16.  Within the next few days, between April 1 and April 4, Howe told Marks that the repairs were his responsibility, but the Company agreed that he "could either have someone come to [WWL] for the repairs or he could take the cart to a repair shop."  May 13, 2014, Howe Email at 2.  By April 4, therefore – 17 days after Plaintiff reported the breakdown – WWL had acquiesced to his demands.

Such a determination did not, however, spur Marks to action.  In fact, he waited over a month before taking the hand truck to a private mechanic on May 12, 2014.  See Marks Dep. 2 at 330:12-19; SOF, ¶ 74.  The next day, he also filed a grievance with WWL, alleging that he had been denied the opportunity to have the hand truck repaired onsite by a technician because of his supervisor's earlier "evasive remarks" and had been unfairly forced to take it for repair offsite.  See 2014 Grievance Form at 1, 3.  He also alleged that he felt this was unfair because he had his "disability documentation on file" – presumably, the earlier DORS occupational report – and he attached a doctor's note from 2009 that he had not previously given to WWL.  Id.. at 3; see also Marks Dep. 3 at 152; Mot., Exh. 13 (2009 Medical Report) at 2; Mot., Exh. 22 (Notice of Grievance); SOF, ¶ 75.  This five-year-old note, though, indicated that he was suffering from indefinite paralysis in his right arm and was unable to lift anything over ten pounds.  See Mot., Exh. 13 (2009 Medical Report) at 2.  These limits conflicted with his current job description, which required that he be able to "regularly move up to 10 pounds, frequently move from 25-60 pounds, and occasionally move up to 100 pounds."  Mot, Exh. 18 (Helper Job Description) at 2.  The note also stated that "he could not work at all" and that he had been last examined on June 7, 2009.  See SOF, ¶ 76.

11

A month later, on June 11, the private mechanic repaired the hand truck by installing a new battery pack, and Marks paid him $424.29.  See Marks Dep. 1 at 342:11-16; Mot., Exh. 21 (Receipt).  At the end of the month, Marks also filed a discrimination charge with the Equal Employment Opportunity Commission, again alleging that he had been denied a reasonable accommodation when he "requested approval for [a] service technician to come to my place of employment in order to repair the hand truck" and had been forced instead to take it elsewhere. See Mot., Exh. 25 (Charge of Discrimination).

A few days later, on July 16, Defendant and Plaintiff met about the May Grievance.  See Marks Dep. 1 at 352:1-18; Mot., Exh. 13 (2009 Medical Report) at 2; Notice of Grievance.  At the meeting, Defendant asked Marks to provide updated medical documentation that accurately reflected the extent of his current disability, and he agreed to do so.  See Mot., Exh. 23 (Email from Jason Savage on July 16, 2014).  The next day, Marks gave them a short note from his physician that confirmed he was permanently paralyzed in his right arm.  See Marks Dep. 3 at 156:21-157:1-11; Mot., Exh. 14 (2014 Medical Letter).  The Company then reimbursed him in full for the repairs.  See Marks Dep. 1 at 343:2-12, 353:6-8.

B.  Procedural

Over a year later, Marks filed this lawsuit, asserting a single count of failure to provide a reasonable accommodation under the Americans with Disabilities Act.  See ECF No. 1 (Complaint).  After discovery, he successfully amended his Complaint to add a second retaliation count.  See ECF No. 23 (Memorandum Opinion & Order on October 4, 2016).  The parties then cross-moved for summary judgment on both claims, and Plaintiff filed a Motion to Strike two of Defendant's related exhibits.  See ECF No. 36 (Motion to Strike).  On May 12, 2017, the Court heard oral argument on all three Motions, which are now ripe.

## II.    Legal Standard

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248; see Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor.  See

Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  In light of this requirement, and

pursuant to Local Civil Rule 7(h) and Federal Rule 56(c), the Court, in resolving summary-

judgment motions, "assume[s] that facts identified by the moving party in its statement of

material facts are admitted, unless such a fact is controverted in the statement of genuine issues

filed in opposition to the motion."  LCvR 7(h)(1).

## III.    Analysis

Both parties argue in dueling Cross-Motions for Summary Judgment that the issues are

sufficiently clear for the Court to end the litigation without a need for trial.  Before reaching the

merits of their arguments, however, the Court must first address Plaintiff's related Motion to

Strike, as it attacks two declarations submitted by Defendant in support of its Cross-Motion.  The

Court then takes up each count in the Amended Complaint separately, explaining why Defendant

is entitled to summary judgment on both.

### A.  Motion to Strike

Civil litigation can be costly for both the parties and the public courts.  Federal courts – to

assure that meritorious cases are appropriately litigated and to protect the judicial system's

integrity – may thus sanction parties who file wholly frivolous or vexatious pleadings that

unnecessarily drive up these costs.  Robertson v. Cartinhour, 883 F. Supp. 2d 121, 125-26

(D.D.C. 2012) (collecting D.C. Circuit precedents supporting imposition of sanctions for

attorney's filing frivolous or harassing motions).  Rule 11 of the Federal Rules of Civil

Procedure, in particular, allows a district court, upon a motion from an aggrieved party, to "order

[the nonmovant] party to pay attorney's fees . . . directly resulting from misrepresentations in

pleadings, motions, and other paper."  Goodyear Tire & Rubber Co. v. Haeger, 137 S. Ct. 1178,

1186 n.5 (2017) (quotation omitted); Fed. R. Civ. P. 11(c)(4).   Although Defendant, charitably

forbearing, never filed such a motion here, a district court may nonetheless impose "an

appropriate sanction," if

> a pleading, written motion, or other paper . . . [is] presented for any
> improper purpose[;] . . . the factual contentions have [no]
> evidentiary support; . . . or the denials of factual contentions are
> [un]warranted on the evidence.

Fed. R. Civ. P. 11(b)(1),(b)(3)-(4), (c)(3)-(4); <u>see also</u> <u>Sibley v. McConnell</u>, 139 F. Supp. 3d 194,

202 (D.D.C. 2015).   This sanction, in short, is particularly appropriate where a motion is not

"well grounded in fact."  <u>Cartinhour</u>, 883 F. Supp. 2d at 125-26.  Unfortunately, Plaintiff's

Motion to Strike looks to qualify, and the Court will thus both deny it and order Plaintiff's

counsel to show cause why Rule 11 sanctions should not be imposed.

 A little procedural background helps to set the stage.  After Defendant filed its Cross-

Motion for Summary Judgment, Plaintiff simultaneously filed a Reply and a Motion to Strike.

<u>See</u> ECF Nos. 35 & 36.  In the latter, it attacked two short declarations – one by Kisha Day and

the other by Jason Savage – that Defendant had submitted as exhibits to its Cross-Motion.  <u>See</u>

Mot. to Strike at 5.  Plaintiff argued that these exhibits should be tossed because they violated

both Rule 56(c)(4) of the Federal Rules of Civil Procedure (though he miscites the subsection)

and the "sham affidavit" rule.  <u>Id.</u> at 6-7.  Neither of these contentions, however, comes close to

having any merit.

 The Motion first mentions Rule 56(c)(4)'s requirement that a declaration be based on

personal knowledge several times and lays out the relevant standard for such affidavits, but never

explains how the exhibits in question violate it.  <u>Id.</u>  Instead, all Plaintiff does is summarily state

that the declarations lack such personal knowledge.  <u>Id.</u> at 7, 12.  This allegation, though, is

belied by the most cursory review of the declarations.  Day's, for example, contains only information directly related to her personal experiences.  Indeed, snippets of her first three factual allegations begin: (1) "Plaintiff Malcolm Marks did not have any conversations <u>with me</u>, or <u>as far as I know</u>, anyone else at WWL . . . "; (2) "Although <u>I requested</u> that Marks meet with me and my supervisor . . . "; (3) "Marks never provided <u>me</u> with any information from his treating physician to support his request for an accommodation."  Day Decl., ¶¶ 4-6 (emphasis added).  Savage's brief declaration, too, follows this familiar and appropriate formula.  <u>See</u> Savage Decl., ¶¶ 11-12.

These declarations, in short, are plainly based on the personal experiences of Day and Savage.  This, of course, is not surprising, given that they both were intimately involved in the events underlying this suit.  Backtracking, Plaintiff concedes in his Reply on this Motion to Strike that these declarations "may have been made on their personal knowledge," thereby expressly undermining one of the pillars of his Motion.  <u>See</u> ECF No. 40 (Reply to Mot. to Strike) at 6.  At the hearing, Plaintiff's counsel repeated this concession and, with surprising reluctance, finally agreed his position had been mistaken.  The Court thus easily concludes that any contention otherwise could not have been made after any reasonable investigation by counsel of the facts.

Plaintiff's second argument to strike these declarations fares no better.  The "sham-affidavit rule . . . bars a deponent from filing a contradictory post-deposition affidavit in an attempt to fabricate a material issue of fact and thus preclude the granting of summary judgment."  <u>Jackson v. Teamsters Local Union 922</u>, 310 F.R.D. 179, 181 (D.D.C. 2015) (citing <u>Pyramid Sec. Ltd. v. IB Resolution, Inc.</u>, 924 F.2d 1114, 1123 (D.C. Cir. 1991)).  To make his case, Marks copies and pastes lengthy deposition testimony from Day and Savage and then,

again, summarily concludes that it contradicts their declarations.  Not only does Plaintiff never

point to what specific statements in the declarations contradict these deposition passages, but a

comparison of the two actually reveals their <u>consistency</u>.

Two quick illustrations prove the point.  In his first salvo, Plaintiff quotes substantial

passages from Savage's deposition discussing emails he received about the motorized hand

truck.  <u>See</u> Mot. to Strike at 7-10.  Savage, in this testimony, affirms that Marks requested a

place to lock up and charge the equipment back in 2011.  <u>Id.</u> at 8.  He also confirms that he got

an email from Hild about the hand truck's breakdown in 2014 and did not later have a

conversation with Day about that email, though he did speak with Hild about it.  <u>Id.</u> at 9-10;

Savage Dep. at 83:20-84:3.  Other block passages also contain seemingly irrelevant answers by

Savage such as:  "[W]hat was John Hild's position at [WWL] at this time?  The vice president of

operations."  <u>Id.</u> at 10 (citing Savage Dep. at 81-83).

After several pages of these strung-together passages, Plaintiff then summarily concludes

– without pointing to any statement in the Savage Declaration – that "Savage [thus] knew that

failing to fix Mr. Marks's hand truck in 2014 was in turn failing to provide Mr. Marks his

accommodation under the ADA[, and his] testimony directly contradicts his allegations related

hereto and stated in his Declaration."  <u>Id.</u> at 10.  Not only is this a legal conclusion masquerading

as a factual allegation, but the Court also finds <u>nothing</u> in Savage's declaration that even

arguably contradicts the provided deposition testimony.  Indeed, the brief Savage Declaration

does not even contain any averments about the 2014 events related in much of this cited

testimony, but instead focuses on the Company's initial understanding of his 2011 request in a

way fully consistent with the cited passages.  <u>See</u> Savage Decl., ¶¶ 6-15 (discussing only the

2011 request and OSHA complaint regarding AND).

The next example is even worse.  Marks contends that Savage admitted that he knew that Marks had filed a second OSHA complaint about the missing AND handrail, even though the cited portions of Savage's deposition say no such thing.  Id. at 11-12.  Indeed, Marks himself conceded that he did not in fact file such a complaint or even a grievance with WWL.  See Marks Dep. 3 at 280:10-12.  As a result, Plaintiff's counsel appears to have acted recklessly in filing this Motion to Strike.  Even a hasty reading of the relevant record would have revealed that there was no basis for this pleading.  In addition, counsels' repeated misrepresentations of the record in their summary-judgment pleadings, discussed more fully infra, do not incline the Court to excuse their performance here as anomalous, see also ECF No. 39 (WWL Reply) at 4-5 (cataloguing examples and citing record evidence), nor does Counsel Leppler's continued repetition of these misstatements at oral argument even after the Court asked him to explain the inconsistencies.

Suffice it to say, Plaintiff's Motion to Strike lacked any colorable basis in the factual record.  Hilton Hotels Corp. v. Banov, 899 F.2d 40, 43-44 (D.C. Cir. 1990) (affirming district court's finding that party "failed to make a reasonable inquiry into the factual basis of the amended complaint" and imposition of Rule 11 sanctions); cf. Marina Mgmt. Services, Inc. v. Vessel My Girls, 202 F.3d 315, 325 (D.C. Cir. 2000) (upholding sanctions for counterclaim "which included allegations not necessarily integrally linked to the legitimacy of the . . . action").  It was simply not based on any "objective standard of reasonable inquiry" into the underlying facts upon which it relied.  Naegele v. Albers, 355 F. Supp. 2d 129, 144 (D.D.C. 2005) (quoting Bus. Guides, Inc. v. Chromatic Commc'ns Enters., 498 U.S. 533, 554 (1991)).  The Court will thus order counsel to show cause why sanctions should not be awarded.  It will also, for the same reason, deny the Motion to Strike.

B.  Reasonable-Accommodation Claim

The Court turns next to the merits of each cause of action.  The ADA forbids covered employers from "discriminat[ing] against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  Discrimination includes the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." Id. § 12112(b)(5)(A).  An accommodation may take the form of "job restructuring, part-time or modified work schedules, [or the] . . . acquisition or modification of equipment."  42 U.S.C. § 12111(9)(B).

To establish a failure-to-accommodate claim, a plaintiff must prove that (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.  Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen., 730 F.3d 450, 452 (5th Cir. 2013) (internal quotation marks omitted).  Here, there is no real dispute that Marks had a qualifying disability or that WWL knew about it.  The central question thus relates to the final element: Did WWL deny Marks a reasonable accommodation for his right-arm paralysis?

To find an answer, the Court must first identify what precisely Plaintiff claims Defendant denied him.  This is not a straightforward inquiry as Marks agrees that WWL did pay for his motorized hand truck's repair on July 16, 2014, immediately after he presented his supporting medical paperwork.  See Marks Dep. 1 at 343:2-12, 353:6-8.  He also does not contest that he still uses this equipment or that the Company has since paid for additional repairs to it.  In other words, Marks cannot contend that WWL denied him a reasonable accommodation either by denying him use of the hand truck or refusing to pay for its repair.

Plaintiff instead appears to argue that WWL effectively denied him an accommodation by being evasive about whether it would approve "fix[ing] his motorized hand truck and/or authoriz[ing] the hand truck repair technician to perform the repairs." Mot. at 20 (emphasis added). The latter issue, in particular, is consistent with how Marks has described the nature of his request for an accommodation from the time that the hand truck broke through the filing of his EEOC Discrimination Complaint. See, e.g., 2014 Grievance Form at 1 (claiming WWL violated his rights by denying his request for "approval for the Service Technician to come to Washington Wholesale in order to repair the hand truck"). By Marks's own repeated assertions, in other words, approval of a service technician to come out would have fully satisfied his claim for an accommodation. His problem is that unrefuted evidence in the record shows that Defendant did approve this request in early April, as explained more fully below.

As a result, all that remains of either part of Marks's claim is a theory that the Company's delay in granting his requests denied him a reasonable accommodation. To be sure, an employer's "unreasonable" delay may constitute the denial of an accommodation in some circumstances. Valle-Arce v. Puerto Rico Ports Auth., 651 F.3d 190, 200 (1st Cir. 2011); Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urban Dev., 620 F.3d 62, 68-69 (1st Cir. 2010) (holding condominium association's delay of more than a year in deciding on request for designated handicapped parking spaces constituted a denial of accommodation request); see also Mogenhan v. Napolitano, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (suggesting there are situations where "a long-delayed accommodation" could be considered "unreasonable" and hence "actionable under the ADA") (quoting Mayers v. Laborers' Health & Safety Fund, 478 F. 3d 364, 368 (D.C. Cir. 2007)). Not any delay, though, can be considered "unreasonable" as a matter of law. Anderson v. Bellsouth Telecommunications, LLC, 2015 WL 461698, at *11 (N.D. Ala.

Feb. 4, 2015) (collecting cases).  A relatively short delay of a few weeks (or even a few months) in approving a request typically does not support such a claim.  Compare id. (two-and-a-half-week delay over two months reasonable), and Kintz v. United Parcel Serv., Inc., 766 F. Supp. 2d 1245, 1256-57 (M.D. Ala. 2011) (15-day delay reasonable), and Terrell v. USAir, Inc., 955 F. Supp. 1448, 1454 (M.D. Fla. 1996), aff'd, 132 F. 3d 621 (11th Cir. 1998) (3-month delay reasonable), and Hartsfield v. Miami-Dade Cty., 90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000) (several-month delay reasonable), with Faison v. Vance-Cooks, 896 F. Supp. 2d 37, 62 (D.D.C. 2012) (multi-year delay raised issue of genuine fact), and Worthington v. City of New Haven, 994 F. Supp. 111, 113-14 (D. Conn. 1997) (same for sixteen-month delay in providing an accommodation).  That is not to say, despite this case law, that such a short delay could never support such a claim, but it does not do so when, as here, there is no evidence that the employer refused to engage in an interactive process with the employee or acted in bad faith in the interim.

So what is the length of the delay here?  It turns out, as fleshed out infra, that Plaintiff's entire accommodation count rests on, at best, a 17-day interval before Defendant granted his request for a technician to come out to fix his equipment.  The Court concludes that is insufficient as a matter of law on these facts, and that WWL also acted with reasonable haste to initiate an interactive process with Marks to determine the full scope of his needs after he first asked for his accommodation.  See 1 Emp. Discrim. Coord. Analysis of Federal Law § 6:69 ("To determine an appropriate reasonable accommodation, the EEOC and a number of courts have taken the position that an employer should initiate an interactive process with the qualified individual."); Marks Dep. 3 at 43:10-44:16 (explaining March was when it broke down); 2014 Grievance Form at 1 (relating request to have technician come to fix hand truck).  Within a day of his request, in fact, Howe asked Human Resources what he should do, and that department

decided swiftly to seek legal advice.  <u>See</u> Savage Dep at 84:1-14; March 19, 2014, Howe Email;

Lundstrom Dep. at 51:1-19.  By April 1, 13 days later, Day from Human Resources met with

Marks in person to discuss the hand truck, and within three days of that meeting, Howe told

Marks that the Company had agreed to allow him to have a technician come to the warehouse to

make repairs.  <u>See</u> SOF, ¶ 70 (citing Marks Dep. 1 at 323:13-22), ¶ 73 (citing Howe Dep. at

32:7-12, 34:12-19 and May 13, 2014, Howe Email).  At most, then, the Company took 2.5 weeks

before granting Marks the accommodation that he sought.  It also continued to engage him on the

issue thereafter.

Before moving on, the Court does note that Marks makes some ambiguous statements in

his briefing about whether WWL <u>ever</u> approved his request for the technician to come onsite.

The problem with such an argument, though, is that he never provides any evidence to shoot

down Howe's account of this critical April 4 conversation.  First, in his Motion, Marks never

directly denies that this conversation happened and, in fact, even cites Howe's email relating its

contents in his statement of relevant facts.  <u>See</u> Mot. at 13-14.  Defendant, too, claimed in its

subsequent statement of the issues that this talk happened between April 1 and April 4 and cited

the same supportive evidence to this effect.  <u>See</u> SOF, ¶ 73 (citing Howe Dep. at 32:7-12, 34:12-

19 and May 13, 2014, Howe Email).  Because Marks never refuted this fact by offering his own

statement of the issues, as required under Local Rule 7(h), the Court could thus consider WWL's

account admitted on this ground alone.  <u>See</u> LCvR 7(h) ("[I]n determining a motion for summary

judgment, the Court may assume that facts identified by the moving party in its statement of

material facts are admitted, unless such a fact is controverted in the statement of genuine issues

filed in opposition to the motion."); <u>Jackson</u>, 101 F.3d at 153 (holding district court has complete

discretion whether to treat facts as conceded where local rule is violated).

The Court, however, need not rest on this here as Marks also fails to identify any evidence to the contrary.  Instead, in his Opposition, he offers a blanket denial that anyone ever approved his request, but, in support, he again cites to Howe's account that says just the opposite.  See Marks Reply at 10, 19, 21, 22.  As mentioned before, this is just one instance where Marks's briefing inaccurately and self-servingly describes evidence that is directly contradicted by the contents of the exhibits he cites.  See also Marks Reply at 1-2; Mot. at 14 (repeatedly claiming Marks took hand truck for repair in June, as repeated at oral argument, contradicting: (1) his own testimony that it was in May, see Marks Dep. 2 at 330:12-19, (2) contemporaneous emails about calls from private mechanic to WWL in May, and (3) the technician's pick-up and receiving ticket dated May 12 that Marks attached to his May Grievance, see 2014 Grievance Form at 10).  In short, Marks offers no competent evidence to refute Howe's account of the April conversation approving his request for an accommodation.

As a result, the Court can at most draw an inference in Marks's favor that the latest date mentioned in the cited evidence is accurate – i.e., that Howe had this conversation telling him that a technician could come on April 4, not April 1.  SEC v. e-Smart Techs., Inc., 85 F. Supp. 3d 300, 308-09 (D.D.C. 2015) ("[J]udges 'are not like pigs, hunting for truffles buried in briefs' or the record.") (quoting Potter v. Dist. of Columbia, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring)).  This brief 17-day period simply cannot support a failure-to-accommodate claim based on unreasonable delay.  Bellsouth Telecommunications, 2015 WL 461698, at *11 (collecting cases holding short delay insufficient).  Indeed, the Court is reluctant to even call WWL's actions a "delay" given that the Company sought to engage Marks in a discussion about the scope of his need for an accommodation during this interval.  Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1262-64 (10th Cir. 2001) (approximately six-month delay in

23

accommodating plaintiff's sinus problems did not amount to failure to reasonably accommodate where defendant took steps to determine extent of limitations in interim). Had it failed to do so, WWL may even have been subjected to liability for this lack of action. See, e.g., Brown v. Potter, 457 F. App'x 668, 670 (9th Cir. 2011). It would be quite a Catch-22, then, if the brief period required to start such a process could also subject the Company to liability, especially where WWL seems to have been seeking to determine whether its obligations to Marks included not only an approval of a technician – as he had requested – but also a covering of the cost of such repairs.

Under such a rule, moreover, an employer would apparently be able to avoid liability only by immediately approving every disability-accommodation request that it received, even where there was no reason to believe harm might follow from a brief delay. Defendant, moreover, had no reason to believe that Marks would suffer any imminent harm from a brief negotiation period over the scope of his needed accommodations. Accord Ungerleider v. Fleet Mortg. Grp. of Fleet Bank, 329 F. Supp. 2d 343, 355 (D. Conn. 2004) (holding failure to immediately approve request for accommodation, even for employee with known disability, did not constitute denial of reasonable accommodation where employer was working on solution over several months). This was similarly not a situation where a brief delay would have rendered Marks unable to perform his job. See Hill v. Clayton Cty. Sch. Dist., 619 F. App'x 916, 922 (11th Cir. 2015) (holding two-month delay could be unreasonable where employee could not work and was not paid in interim). As a reminder, Marks spent his first 14 months at WWL successfully using a manual hand truck without complaint or apparent issue. Over the course of his time at the Company, Marks also repeatedly broke off efforts to complete an interactive process about his need for any accommodation. In addition, it does not appear that

Marks was even harmed by his brief stint doing so again.  He certainly acted with little haste to

get the hand truck fixed, as he waited an entire month to take it for the repairs after he got the

green light from Howe.  Put simply, the brief delay he experienced in getting the accommodation

he sought here was reasonable as a matter of law.

In fact, the Court is perplexed about what <u>damages</u> Plaintiff even claims from this 17-day

delay given misrepresentations about his purported injury.  In other words, what relief Marks

hopes to obtain from this suit remains opaque.  At the hearing on the Motion (and in his brief),

for example, his counsel asserted shoulder injuries, but his citation to two medical reports from

2016 offered no aid, as they clearly indicated that he suffered such injury from a slip and fall in

January 2015 – <i>i.e.</i>, a year <u>after</u> the events related to this litigation.  These reports contain <u>no</u>

evidence relevant to his claims here, and his assertion that they actually establish his damages

with regard to these 2014 events is consistent with other misrepresentations to the Court.  <u>See</u>

Mot., Exhs. 38-39.

Finally, the record likewise cannot support the conclusion that the Company

unreasonably delayed paying for the hand truck's repairs.  Marks, in fact, never pinpoints when

he asked that the Company cover these costs.  When he filed his Grievance Form on May 13,

2014, his description of his complaint was still entirely focused on his request for a technician to

come to the warehouse to fix the equipment and the Company's effective denial of this specific

accommodation through what he calls "evasive remarks."  2014 Grievance Form at 1-2

(mentioning in particular that Savage never approved this).  As late as June 13, too, when he

filed his EEOC Discrimination Complaint, he was still focused on the denial solely as it related

to having a technician visit WWL.  <u>See</u> Discrimination Complaint (reiterating he asked for a

technician and, this time, stating an unnamed supervisor never greenlighted it).  About a month

thereafter, on July 16, 2014, the Company reimbursed him in full for the repairs.  See Marks

Dep. 2 at 343:2-12.  Again, then, at most the record could support the conclusion that Marks

endured a *de minimis* delay here of about five weeks in obtaining his funds.

As a result, the Court concludes that WWL is entitled to summary judgment on this

count.

C.  Retaliation Claim

In his next cause of action, Plaintiff alleges that the delay in fixing his hand truck also

constituted retaliation for his complaints about safety conditions at WWL's client locations.  "To

prove unlawful retaliation, an employee must establish three elements: that [he] made a charge or

opposed a practice made unlawful by [the ADA], that the employer took a materially adverse

action against [him], and that the employer took the action because of [his] protected conduct."

Allen v. Johnson, 795 F.3d 34, 38-39 (D.C. Cir. 2015) (quoting McGrath v. Clinton, 666 F.3d

1377, 1380 (D.C. Cir. 2012)).  As indicated above, WWL's delay in fixing the motorized hand

truck likely did not amount to sufficiently adverse action, even though the requirement for such a

showing is lower for a retaliation than an accommodation claim.  Baloch v. Kempthorne, 550

F.3d 1191, 1198 n.4 (noting "adverse actions in the retaliation context encompass a broader

sweep of actions than those in a pure discrimination claim").  Summary judgment in favor of

Defendant is nevertheless warranted on this count most clearly because Marks has not produced

evidence to support the first or third elements.

As to the first – protected conduct – Plaintiff points only to his filing of the OSHA

complaint against Wonderland for its missing handrail and his threat to do the same with regard

to AND.  See Mot. at 24.  But the plain statutory language of the ADA precludes his reliance on

these complaints for this purpose.  The ADA's retaliation provision forbids an employer from

"discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a) (emphases added).

Marks has offered no evidence or argument that the missing handrails were "made unlawful" by this ADA chapter, nor did Marks ever register any complaint about them "under" the ADA.  On the contrary, the acts that he opposed – *i.e.*, the missing handrails – and his OSHA-related complaints about them pertained to general safety conditions at these two delivery locations.  This condition was made unlawful by OSHA, a statute that protects the safety of all workers, whether disabled or not.  His sole complaint likewise arose under the separate reporting scheme for violations provided in OSHA, which contains its own retaliation provisions that he did not apparently pursue.

Marks, moreover, never connected these safety reports to his disability.  He, in fact, made the OSHA complaint about Wonderland in the name of his apparently non-disabled driver, Cromer.  See Marks Dep. 3 at 236:14-240:17 (describing complaint in general safety terms similar to others he had made), 264:7-16, 273:7-19 (explaining OSHA complaint was made in Cromer's name); Mot., Exh. 36 (Email from Nancy Ball on Aug. 30, 2013) (relaying Wonderland "received a letter during shutdown saying that a WWL driver submitted their name to OSHA").  Marks's grievances about these problems contain no reference to his disability, and he was using his motorized hand truck at the time that he encountered these deficiencies.  See Cross-Mot., Exhs. 31 (Marks's Wonderland Report), 37 (AND Report).  The handrail issues thus raised only general workplace-safety concerns.  See Marks Dep. 3 at 237-38 (describing his fear "somebody is going to get hurt"); id. at 241 (describing how he had not even noticed the issue

until he almost slipped and fell, having nothing to grab onto). As a matter of law, therefore, they do not qualify as protected activity under the ADA. Stouch v. Twp. of Irvington, 354 F. App'x 660, 667 (3d Cir. 2009) (holding OSHA complaint not protected activity under ADA where Plaintiff failed to connect it to his disability); Washington v. M. Hanna Const. Inc., 299 F. App'x 399, 401 (5th Cir. 2008) (holding report "to authorities for violating OSHA does not qualify as protected activity under Title VII"); Brown v. Superior Contract Cleaners, 2011 WL 4055166, at *5 (W.D.N.Y. Sept. 12, 2011) (same and collecting cases). For this reason alone, Defendant is entitled to summary judgment on this count.

Yet, the retaliation claim also falls short for another reason – namely, no reasonable juror could infer a causal connection between these complaints and Defendant's later delay in paying for the hand-truck repairs. Marks relies this time on an admittedly troubling email from WWL's general director, John Hild, on August 29, 2013, to Jason Savage in Human Resources, which asks about possible "option[s] and discipline" that could be taken as a result of Wonderland's decision to cancel its account. See Aug. 29, 2013, Hild Email. Savage, however, testified that he responded to Hild the next day by explaining that no action could be taken against an employee for filing an OSHA complaint. See Savage Dep. at 44:6-19.

More importantly, a full six months went by between this email and the hand truck's breakdown in March 2014. During this time, Marks does not allege that WWL took any adverse actions against him. Any temporal connection between this email and the delay in authorizing his hand-truck repairs is therefore attenuated at best. Cf. Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("[C]ases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that temporal proximity must be 'very

close,'" and the passage of three or four months generally eliminates any such inference.) (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)).

Most critically, though, the Company's decision to ask for more paperwork before approving the repairs in March 2014 was not a new position that might have been staked out in retaliation for these complaints. Savage and Day, in response to his request for the repairs, simply reiterated the same policy that they had previously articulated with regard to his prior requests for accommodations. See March 19, 2014, Savage Email; May 13, 2014, Howe Email; Marks Dep. 1 at 321:1-22; Marks Dep. 3 at 154:22-155:9; Apr. 1, 2014, Day Email. Dating back to 2011, Day had consistently and repeatedly told Marks that he would need to give her this paperwork before the Company approved any accommodations. See, e.g., Oct. 20, 2011, Day Email to Savage (explaining request for medical documentation prior to approval of Marks's initial accommodation). In other words, whether WWL was correct or not as a matter of law about the need to substantiate his disability, its response in March 2014 was not some new position articulated in response to Marks's safety complaints. See Savage Dep. at 72:5-18.

Additional evidence exists to support this conclusion on causation. First, the OSHA complaint listed Cromer as the complainant, but WWL never took any adverse action against him for filing it. Second, these safety complaints were just the most temporally proximate in a succession of grievances that Marks filed during his time at WWL. See Marks Dep. 2 at 295: 7-14 (explaining there have "been so many [grievances filed against WWL]. I can't recall them all . . . . If I felt I've been – something wrong, I write it up."); Marks Dep. 3 at 236:1-9 (discussing two other complaints about greasy floors at Ted's Bulletin), 284-286 (describing other grievances about t-shirts and contract violations); Cross-Mot., Exhs, 22-28 (documenting several 2011-212 complaints about injuries, safety issues, pay, and unfair discipline). The

Company never took any identified action against Marks for these repetitive grievances, even though some included safety issues similar to the missing handrails.  See Cross-Mot., Exh. 29 (complaining of safety issues in May 2012 at multiple customer locations, including "steep steps" and "steep hills in the parking garage").

Worth noting as well, is the fact that Marks himself testified that the Company had a culture of encouraging its employees to flag these sorts of issues and promote safety at their worksites:

> Marks:  So if I see a safety issue and I say, [w]ell, I'll take it upon myself to take it down the stairs even though I see the safety issue and it falls and breaks, I have to come back to Mr. Cromer and say, Look, Mr. Cromer, I went to make an attempt to deliver down the stairs, it fell.  It broke up.  The first thing he's going to say, Well, why did you even attempt?  You know our safety concerns.  We have safety meetings quarterly.  Quarterly.  And they're very adamant on safety.  That is all they preach, safety.  If you think in your heart that it's wrong to do, call.  So that's what they do.  They implement us.  They teach us.  That's all they ever do is safety.  So if I have a problem, I go straight to [WWL management and file a report] . . . . They'll go out and do the investigation in a timely fashion because in the meanwhile we're still delivering that product to that same entity . . . . [T]hey teach us, Look, safety is first.  That's – they're very, very adamant in safety.
>
> Q:  The company is adamant about safety, right?
>
> Marks:  Yes.
>
> Q:  And they are constantly preaching safety.
>
> Marks:  They are constantly preaching safety.

Marks Dep. 3 at 246-49.  Taking all these facts together, the Court simply finds no ground upon which a reasonable juror might infer that WWL's delay in activating the hand-truck repair in March 2014 was a response to Marks's OSHA complaints about the handrails in 2013.

As such, the Court will also grant summary judgment to Defendant on this count.

## IV.     Conclusion

For the reasons provided above, the Court will deny Plaintiff's Motion to Strike and his

Motion for Summary Judgment, and it will order his counsel to show cause why sanctions should

not be imposed for filing a frivolous pleading.  It will also grant Defendant's Motion for

Summary Judgment in full.  Contemporaneous Orders will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

**Date:**  May 26, 2017